[Civil No. 588.    Filed June 11, 1898.]

[53 Pac. 590.]

GEORGE W. HENRY, Plaintiff and Appellant, v. JOSEPH MAYER et al., Defendants and Appellees.

1. EQUITY—TRIAL—JURY—GRANTING OF REQUEST FOR—ISSUES OF FACT TO BE SUBMITTED—DISCRETIONARY.—In a cause of equitable jurisdiction it is wholly within the discretion of the court whether or not a request for a jury shall be granted, and if a jury be called, as to what issues of fact shall be submitted to it.

2. SAME — SAME — SAME — VERDICT — FINDINGS — DISREGARDING — NO NECESSITY FOR FORMALLY SETTING ASIDE.—In a suit involving equitable jurisdiction only the trial court is at liberty to disregard the verdict and findings of the jury and make its own findings and enter a decree in accordance with the latter, and this without formally setting aside the verdict and findings of the jury before entering the decree.

3. SAME—SAME—SAME—SAME—ADOPTION BY COURT—APPEAL AND ERROR—REVIEW—TO BE REGARDED AS FINDINGS OF COURT.—The adoption by the court in its decree in an equity case of the findings of the jury was discretionary with the court and must be regarded simply as the findings of the court, and not of the jury, in so far as they may be reviewed on appeal.

4. SAME—GROUND OF RELIEF—FOLLY—FRAUD—MISREPRESENTATION AND DECEIT.—Where it is evident that the party seeking relief has

gotten the worst of the bargain, if this be due to his own folly and shortsightedness, and not to any willful misconduct on the part of the defendant or his agents, equity can afford him no relief not within the strict letter of his contract. But if, on the contrary, he be the victim of misrepresentation, fraud, and deceit practiced by and directly traceable to defendant, or indirectly through any of defendant's agents, then equity can and should afford him relief at the expense of defendant.

5. SAME—APPEAL AND ERROR—REVIEW—FINDINGS—ONLY HELD ERRONEOUS FOR FORCIBLE REASONS—DEPENDENT ON CREDIBILITY OF WITNESSES—ON DEDUCTION FROM UNDISPUTED FACTS.—The findings of the trial court should be given great weight, and be deemed conclusive, on controverted questions of fact in equity as in actions at law, unless there be forcible reasons to warrant the inference that they are erroneous. Particularly so when the findings depend upon the credibility of witnesses, and not merely upon deductions from facts concerning which there is little dispute.

6. SAME — SAME — SAME — FRAUD — EVIDENCE—MATTER OF DEDUCTION FROM ACTS—CAREFULLY REVIEWED—SUFFICIENCY TO SUSTAIN FINDINGS AND DECREE.—Where the gravamen of the complaint is fraud, it being rarely open, visible, or susceptible of direct and positive proof, and most usually a matter of inference to be drawn from the actions and conduct of men who at the time are careful to cover up their purposes and intent to deceive, so as to avoid detection and enjoy in safety the fruit of their wrong-doing, this court will carefully review the evidence to see whether it supports the findings and decree.

7. PRINCIPAL AND AGENT—EVIDENCE OF AGENCY—OPTION TO PURCHASE PROPERTY.—Where an option to purchase is nothing more than an authorization of the holder to find a purchaser, and for such service he is to receive a commission on the amount of the purchase money, he will be held to be the mere agent of the owners in effecting a sale.

8. MINES AND MINING—FRAUD—MINING REPORT—SUBSTITUTING ORES— EVIDENCE—INSUFFICIENT TO JUSTIFY REVERSAL OF FINDINGS.—Evidence that the report of the expert employed by the purchaser of a mine, whose competency and honesty were not impeached, grossly exaggerated the value of its ore, and that there was abundant opportunity for substitution of ores, upon which the report was based, by the vendors and their agents, while sufficient to justify a suspicion that the expert had been deceived in their values, does not warrant a reversal of the finding of the trial court that there was no fraud or knowledge of fraud on the part of the vendors in inducing the vendee to enter into a contract for the purchase of the mine.

9. SAME—SALES—VENDOR AND VENDEE—PRINCIPAL AND AGENT—COMMISSION—FRAUDULENT REPRESENTATIONS AS TO AMOUNT—RECOVERY. —Where the vendor of a mine and his agent represent to the vendee that there is to be no commission paid other than five thousand

dollars to this agent, and it is admitted that at the time the agent was to receive, and did receive, twenty-five thousand dollars, the vendee is entitled in equity in an action against the vendor to a reduction in the purchase price to the extent of the fraudulent commission.

10. SAME—EQUITY — MISREPRESENTATIONS — FORFEITURE INDUCED BY— RIGHT TO POSSESSION.—A plaintiff who had advanced all the funds and was the owner of practically all of the stock of a corporation operating a mine under a contract of purchase was induced by the representations as to what could be done with the property, made by a man who subsequently proved to be the agent of the owner of the mine, to pay off a large indebtedness of the company, to advance funds, enter into a new agreement regarding payment for the mine, and to permit this agent to run the property. The agent operated it for several months, and until debts not reported to the owner had so accumulated as to render further concealment impossible. He then, without notifying the corporation or plaintiff, turned the property over to the owner, who took possession under a forfeiture clause in his contract of sale. The circumstances were such as to justify the belief that at the time of entering into the new arrangement and agreement for the payment for the mine it was impossible that it could be successfully carried out. Plaintiff having put himself in a worse position in regard to the purchase than before he acted on the representations of the owner's agent, the taking possession was unwarranted, and the decree, in so far as it recognized the owner's right to the possession, was erroneous.

11. VENDOR AND VENDEE—SALES—CONTRACT OF—FORFEITURES OF LAND NOT OWNED BY VENDOR—NOT ENFORCED IN EQUITY—NOT FAVORED IN LAW.—Real estate cannot be forfeited to another which the other has never owned, and to which he has not title, because of a failure to pay for property which the vendor did own, and to which he did have title. Forfeitures are not enforced in equity and are not favored in law.

12. MINES AND MINING—CONTRACT OF SALE—FORFEITURE OF MILL PROVIDED TO BE BUILT ON OR ADJACENT TO THE MINE—WILL NOT BE ENFORCED WHEN BUILT OFF THE PROPERTY SOLD.—Where a contract for the sale of a mine provided that the purchaser should build a mill on "or adjacent" to a mine, and in case of failure to comply with the express condition of the contract, the mine and all improvements placed on "or adjacent to" said mines, including said mill, should be forfeited to the vendors, equity will not enforce said forfeiture clause, in so far as it affects the mill and machinery constructed on property not the subject of sale between the parties

13. CORPORATIONS—ADVANCES—SUBROGATION.—Where plaintiff advanced all the funds used by a corporation of which he is the chief stockholder, he is entitled to be subrogated to the rights of the corporation.

14. MINES AND MINING—CONTRACT OF SALE—POSSESSION—ACCOUNTING —OWNER WRONGFULLY TAKING POSSESSION MUST ACCOUNT FOR PROFITS TO ONE ENTITLED THERETO.—Where the owner of a mine wrongfully takes the possession thereof from one entitled thereto under a contract of purchase, he must account for all profits derived from the working of said mine while so wrongfully in possession.

15. EQUITY—CONTRACT OF SALE—FORFEITURE—EXTENSION OF TIME FOR PERFORMANCE OF CONDITIONS OF SALE.—Under the evidence, plaintiff will be given ninety days in which to pay the balance of the purchase price after he is placed in possession and an accounting is had, and, if he elects so to do, defendant shall convey the property to him; in case the balance is not so paid, then a master shall sell the property as provided by law for the sale of real property under execution, and shall out of the proceeds pay to the defendant the balance due upon the purchase price of said mine and the balance to the plaintiff.

APPEAL from a judgment of the District Court of the Fourth Judicial District in and for the County of Yavapai. John J. Hawkins, Judge. Reversed.

The facts are stated in the opinion.

J. F. Wilson, W. H. Barnes, and F. A. Johnson, for Appellant.

Parties in chancery cases have no right to demand a trial by jury. It is a right which exists at common law, but does not extend to cases in equity. *Walker* v. *Sedgwick,* 5 Cal. 192; *Cahoon* v. *Levy,* 5 Cal. 294; *Pacific Ry. Co.* v. *Wade,* 91 Cal. 499, 25 Am. St. Rep. 201, 27 Pac. 768, 13 L. R. A. 754; *Cassidy* v. *Sullivan,* 64 Cal. 266, 28 Pac. 234; *Bodely* v. *Ferguson,* 30 Cal. 511; *Fish* v. *Benson,* 71 Cal. 428, 12 Pac. 454.

The agents represented that they were to receive a commission of five thousand dollars. In fact, they received twenty-five thousand dollars. This was fraudulent, and appellant should be allowed to recoup all above the five thousand dollars which was paid to agent as commission, and which therefore constituted no part of the purchase price.

Herndon & Norris, for Appellee.

SLOAN, J.—The appellant brought this suit in the court below to obtain equitable relief upon the ground of fraud and

deceit in the sale of certain mining claims situated in Yavapai County, on the part of certain of the appellees, and to be subrogated to the rights of the Henrietta Mining and Milling Company, one of the defendants in the action under the contract of sale of said mines. The record discloses that in April, 1893, the appellees Joseph Mayer, Joel B. Slack, and James H. Slack were the owners of the Silverton and the Yankee Girl mining claims, and the appellees A. L. Butler, John Kelley, Frank Bliss, and said Joel B. and James H. Slack were the owners of the American Flag, the Invincible, and the Germania mining claims, all situate in the Big Bug Mining District, said county of Yavapai; that on April 6, 1893, said Mayer and Joel B. and James H. Slack gave to one H. N. Palmer an option to purchase said Silverton and Yankee Girl mining claims, for sixty days, for the sum of fifty thousand dollars; that about the same time the appellees Butler, Kelley, Bliss, and said Slacks bonded the American Flag, Invincible, and Germania mining claims to said Palmer for the sum of ten thousand dollars until July 3, 1893. The option given by Mayer and the Slacks was extended by agreement until the twenty-sixth day of June, 1893. Early in June, 1893, one James Shirley obtained from Palmer a written option for the purchase of said mining claims for the sum of one hundred thousand dollars. Upon the procurement of said option, Shirley visited the city of Chicago, and there met one Spooner R. Howell and one Frank M. Bradshaw, who introduced him to appellant, George W. Henry. Shirley represented himself as the agent of the owners of said properties to sell the same, and that he was to receive no commission for making the sale of said mines; but in the event of his finding a purchaser or purchasers he would look to the latter for his compensation. As a result of Shirley's representations, Howell, Bradshaw, and Henry became interested in the purchase of said mines, and sent one F. W. Ihne, a mining expert, to Arizona with Shirley to make an examination and report as to their value. Ihne visited the mines, produced ore therefrom, had a mill-run made of fifteen tons of ore, and as a result of his investigations and tests made a report, in which he stated, among other things, that a large amount of development-work had been done, and that there was in sight in the mines 62,625 tons of ore, of an average value of.

fifty dollars, and aggregating in value the sum of $3,281,250. On the receipt of this report, Howell, for himself and his associates, Henry and Bradshaw, came to Prescott for the purpose of making the purchase of the mines. Howell was met in Prescott by Palmer and Mayer and negotiations were then begun between Howell, Mayer, and Palmer for the purchase of the mining claims by the former. Before these negotiations were ended Palmer's option had expired, and the subsequent dealings were had between Howell and Mayer. As a result of these negotiations, an agreement to purchase was entered into between Howell, acting for himself and his associates, and Mayer, by the terms of which agreement Howell agreed to purchase the mines for the sum of one hundred thousand dollars, of which sum twenty-five thousand dollars was to be cash, twelve thousand five hundred dollars to be paid in sixty days after the execution of the agreement, and twelve thousand five hundred dollars in four months from the date of the agreement, and the remaining fifty thousand dollars to be paid on or before March 1, 1894. Howell further agreed to erect a twenty-stamp mill for the purpose of milling the product of the said mines on or at a place adjacent to said mining claims to be by him selected, and to pay one half the gross proceeds derived from the working of said mines in the shape of ore, bullion, concentrates, or otherwise to said Mayer, which was to be credited upon the unpaid purchase money until the same should be fully paid. Howell was to have full possession of all the property sold, and the full right of mining and extracting ores therefrom during the life of the agreement. Mayer agreed to execute a good and sufficient deed to all of said property and place the same in escrow with the Bank of Arizona, in Prescott, to be by said bank delivered to said Howell, his heirs, agents, or assigns, when the full purchase price should be paid. One of the terms of said agreement reads as follows: "A failure or refusal of said second party [Howell], for ten days after notice in writing given to him or his agent, to comply with any one of the obligations on him herein imposed, shall work a forfeiture of all his rights under this contract; and all of the money which he shall have paid, and all of the improvements by him placed on or adjacent to said mines, including said mill and all of its connections, and all of said mines, said water-

rights, and other appurtenances thereunto belonging, shall belong to and become the absolute property of said first party (Mayer), and there shall be no recourse on him, said first party; and said Bank of Arizona shall deliver to first party said deed left in escrow and this agreement.'' The date of this agreement was July 1, 1893. Prior to its execution Mayer had secured from the two Slacks an agreement to purchase their interest in the property for the sum of twenty thousand dollars, and from A. L. Butler, John Kelley, and Frank Bliss an agreement to purchase their interests for the sum of ten thousand dollars.

Howell, in accordance with his agreement, on the date of the execution thereof, paid to Mayer the sum of twenty-five thousand dollars. Howell and his associates, Mayer, Bradshaw, and Shirley, and one L. J. Webber, organized the Henrietta Mining and Milling Company, whereupon Howell assigned all of his rights under said agreement to the company. Shirley was elected manager of the company, took possession of the mines, and began development-work and the construction of the mill. The latter was completed in December, 1893, and was operated by the company until January 4, 1894. During this time twenty-five thousand dollars, in addition to the cash payment, was paid, under the agreement to purchase, to Mayer, and about forty thousand dollars expended in the erection of the mill and in development work upon the mines. During the short time the mill was in operation prior to January 4th it was operated at a loss, and a debt of something like thirty-three thousand dollars was incurred. Early in January, 1894, Henry came to Prescott and arranged to pay the indebtedness on the property, bought out Howell's interest in the company for ten thousand dollars, and also the interest owned by Shirley and Webber, and entered into an agreement with Mayer, modifying the first agreement in the respect that the balance of the purchase money then unpaid, which was the sum of fifty thousand dollars, should be paid to Mayer from the product of the workings of said property, as follows: One half of the gross product of said mines after milling was to be paid to Mayer until he should have received the full sum of fifty thousand dollars, and the said mines were to be worked and operated until he was fully paid. Palmer was to receive the entire

product and yield of said mines and mill, place the same in the Bank of Arizona, in Prescott, pay over one half of the same to Mayer from time to time, and the other half to be placed to the credit of the Henrietta Mining and Milling Company after paying the necessary and legitimate debts incurred in the working and operating of said mines and mill. He was to continue to have the right to so receive and pay out the proceeds of said mines and mill until said sum of fifty thousand dollars was paid to said Mayer. Under this agreement, Palmer took possession and control of the mines, mill, and property as manager, and continued to control and manage the same until the fifth day of May, 1894. During this time, from three to four thousand tons of ore were milled, from which was realized the gross amount of $18,179.95. One half of this amount was paid to Mayer by Palmer under the agreement, and the other half used in paying the expenses of the operation of the property. A debt of twenty-one thousand dollars was incurred by Palmer in his management of the property. No reports were made by Palmer to the company during his control of the same, although frequent demands were made upon him by Henry and the officers of the company for statements showing the outputs of the mines, the receipts from the sale and working of the ores, and the expenses of mining and milling. About the 8th or 9th of April Palmer wrote to Henry that the mine was running behind and was in debt to the amount of eighteen thousand dollars. Henry immediately came to Prescott, and found from an examination that the condition of things was as reported by Palmer. On the 4th of May Palmer shut down the mill and turned the possession of the property over to Mayer, who thereupon claimed the same, both mines and mill, as having been forfeited to him under the terms of his agreement. Mayer has remained in possession of the property ever since.

The grounds of relief charged in the complaint are: First. That the contract or agreement for the purchase of the mines, dated July 1, 1893, was procured by means of the false and misleading character of the report made by Ihne as to the condition and value of the mines; that at the time Ihne made his examination of the property he was the guest of Mayer and Palmer, who supplied him with liquors during his visit to and pretended examination of said mines to such an extent

that Ihne was thereby rendered incompetent to properly ex-
amine the mines and to guard against deception, and that,
instead of personally superintending and directing the sam-
pling of ores from the mines and the testing of the same, he
was, by reason of the fraudulent misconduct of Mayer and
Palmer, imposed upon, misled, and deceived as to the value of
the ores in sight in the mines; that Palmer and Mayer so con-
nived with the owners of the same that the ores sampled by
Ihne did not fairly represent the average values of said ores,
but, on the contrary, showed results from six to ten times
more than the fair average value of the same; that the fraud·
and deception in the above respect so practiced upon the ap-
pellant and Howell by said Mayer and Palmer were intended
by the latter to procure the sale of the mines at a grossly
exaggerated value, and constituted the inducing cause which
led to the execution of the agreement of July 1, 1893.   Sec-
ond. That Howell and appellant were deceived by the repre-
sentations of Palmer and Mayer as to the real purchase price
of the property, in this: that they falsely stated and repre-
sented to said purchasers that the only commission allowed to
Palmer under his agreement with Mayer was one of five thou-
sand dollars, when in truth and in fact Palmer was to receive
a commission of twenty-five thousand dollars for negotiating
and assisting in the sale of the mines; that the false repre-
sentation as to the amount of commission Palmer was to
receive was made for the purpose and intent on the part of
Palmer and Mayer to deceive the purchasers as to the value
of said mines and the lowest price for which they could be
purchased; that these representations so made by Palmer and
Mayer were believed by Howell and appellant and consti-
tuted one of the inducing causes which led to the contract of
purchase.   Third. That the contract of January 4, 1894, was
procured by Palmer and Mayer by means of false and fraudu-
lent representations, and for fraudulent purposes; that the
representations were, that the values contained in the ores
were sufficiently high to permit of the working of the mines,
extraction of ores, and the milling of same, at a handsome
profit, and that in this way might be realized the money
needed to complete the purchase of the property within the
time specified in said agreement; that at the time the said
agreement was entered into both Palmer and Mayer well

knew the true value and productiveness of said mines, and that under said agreement no profit could be realized therefrom by said company, but they falsely represented the true value and condition of the mines with intent thereby to obtain possession and contract of said mill, machinery, mines, and other property, and to so manage the same as to make the same unprofitable, and to bring the same into debt, and thereby to claim a breach of said contract on the part of said company, and to enable them to claim as forfeited the money paid upon said contract of purchase, and claim as forfeited all the rights of said company in and under said contract. Fourth. That the appellant is entitled to be subrogated to the rights of the Henrietta Mining and Milling Company by reason of the fact that he contributed all the money expended in the purchase of the same, in the development-work done upon the mines, and in the construction of the mill and other machinery connected therewith, and that no one else has contributed any money under said contracts of purchase.

No answer was put in by any of the defendants in the action with the exception of defendant Mayer, who denied specifically all the acts charged in the complaint to be of fraudulent nature and character, and such acts as were charged which would entitle the appellant to the relief he sought. Upon the trial of the case the court submitted certain issues in the form of interrogatories to the jury against the objection of the appellant. These issues, as submitted, were all found by the jury against the appellant, and in favor of the appellees, with the exception that the jury found that all the money which had been paid in purchase of the mines, the erection of the mill, and in the working and operation of both had been paid by appellant. Following the verdict of the jury, the court found that appellant was not entitled to a rescission of the contract of purchase of the mines, as prayed for in his complaint; that the purchase price for the mining property mentioned was one hundred thousand dollars; that all of the purchase price paid and the money spent upon the property was advanced by appellant, George W. Henry, and that therefore said Henry should be subrogated to the rights of the Henrietta Mining and Milling Company under said agreement; that of the purchase price the sum of $60,475 had been paid, and the sum of $39,525 remained un-

paid. . The court decreed that appellant might complete the purchase of said mining property by paying appellee Joseph Mayer the said sum of $39,525 on or before six months from the first day of April, 1896; and further, that appellant might enter into the possession of said property and work and operate the same during said period of six months, provided one half the gross proceeds thereof be paid to Mayer until he should have been paid the full sum of $39,525, with interest thereon at the rate of seven per cent per annum from the time of taking possession. The decree further provided that in the event the appellant took possession of the property, he should continuously work and operate the said property until Mayer should be fully paid; provided further, as a condition precedent to appellant taking possession of said mines, he should execute and deliver to Mayer a good and sufficient bond in the sum of forty thousand dollars, to be approved by the court, conditioned that he would not run the said property into debt or make any debts or claims of any kind or character against said property, and that he would work the same in minerlike fashion, and in such a way as to preserve said mines as workable property, and to return the same clear of debts in a good and workable condition at the end of said six months in case the payment of the balance of the purchase price should not be paid. It was further provided in the decree that if at the end of the said six months Henry should be in possession of the property, and in good faith working and operating the said mines, and making payments thereon of one half the gross proceeds, and keeping said property out of debt, he should have an additional six months further time in which to complete the payment as above provided. In case Henry should pay the full sum of $39,525 within six months from the first day of April, 1896, the decree provided that Mayer should make, execute, and deliver to appellant a good and sufficient deed conveying to appellant said mining properties—to wit, the American Flag, Invincible, Silverton, and Germania mining claims. From the decree so entered, appellant has brought this appeal.

The first question presented by appellant in his brief for our consideration relates to the submission to a jury of the issues of fact raised by the pleadings. Appellant contends that as the action is one for equitable relief wholly, and in-

volving equitable rights, requiring equitable relief, it was error to submit to a jury the determination of the issues of fact. It is true that, the cause being one of equitable jurisdiction, the court below was not bound to submit any issue of fact to a jury, but, on the contrary, might in its discretion have properly refused the request made by appellee Mayer for a jury trial. In other words, it was wholly in the discretion of the court as to whether or not a jury should be called, and if called, as to what issues of fact should be submitted to it. It is also well settled that in an action involving equitable jurisdiction only the trial court is at liberty to disregard the verdict and findings of the jury and make its own findings and enter a decree in accordance with the latter; nor is it necessary in such a case that the court formally set aside the verdict and findings of the jury before entering a decree in accord with its own findings. *Improvement Co.* v. *Bradbury,* 132 U. S. 509, 10 Sup. Ct. 177, and cases therein cited. No error, therefore, can be predicated upon the action of the court in this case in submitting to the jury certain issues of fact. The adoption by the court in its decree of the findings of the jury was discretionary with the court, and must be regarded simply as the findings of the court, and not of the jury, in so far as we are privileged to review the same upon this appeal.

With reference to the merits of the action, the issues of fraud raised by the pleadings are such as to necessitate a careful review of the testimony in the cause. The trial court found that Mayer was not guilty of any fraud or misconduct in the sale of the mines which affected his right as vendor to enforce in their entirety the terms of the sale as contained in the two contracts; and the decree was framed upon this finding, so as to secure to him all the fruits of his dealings with Henry and his associates. Under the decree, assuming that Mayer was entirely innocent of any misconduct in the sale, it is quite evident that he has profited by the failure of the purchasers to complete the contract. The court found that the purchase price for the whole property was one hundred thousand dollars; that Mayer had been paid in all the sum of $60,475; and that there was left a balance of said purchase price of $39,525. It is admitted, too, that at the time when the negotiations began for the purchase of the prop-

erty Mayer owned but a one-half interest in two of the claims
sold—to wit, the Silverton and the Yankee Girl mining claims.
It was shown that he bonded from the other owners in the
property sold their interests for the sum of thirty thousand
dollars, and subsequently paid them this amount out of the
proceeds of the various payments made by appellant, which
left for him the sum of $30,475 for his individual interest in
the two claims. Under the decree, therefore, he is allowed to
retain the amount of money received from the purchasers,
and to retain as his own all of the property which he con-
tracted to sell for the sum of one hundred thousand dollars,
together with the added improvements put thereon, and the
mill and the machinery purchased by appellant and placed
upon the property not originally owned by Mayer, and which
cost the sum of forty thousand dollars.

Before one should in good conscience be permitted to reap
where he has not sown, to profit by the misfortune, mistake,
or undoing of another, or to enjoy the fruits of dishonesty and
sharp practice, it should appear perfectly plain that he him-
self be free from any intentional wrong-doing and his skirts
clean of any stain of fraud and deceit. It is evident that
appellant has gotten the worst of the bargain and fared badly
in his adventure. If, however, this be due to his own folly
and shortsightedness, and not to any willful misconduct on
the part of appellee Mayer or his agents, equity can afford
him no relief not within the strict letter of the contract un-
der which he seeks to be subrogated to the rights of the Hen-
rietta Mining and Milling Company. But if, on the contrary,
he be the victim of misrepresentations, fraud, and deceit prac-
ticed by and directly traceable to Mayer, or indirectly through
any of his agents, then equity can and should afford him
relief at the expense of Mayer. The findings of the trial court
should be given great weight and be deemed conclusive on
controverted questions of fact in equity as in actions at law,
unless there be forcible reasons to warrant the inference that
they are erroneous. Particularly should this rule be regarded
when the right determination of the facts may have depended
upon the judgment of the trial court as to the credibility of
the various witnesses, and not merely upon reason and de-
duction as applied to a mass of facts and circumstances about
which there may be little or no dispute. The gravamen of

the complaint in this action is fraud. Unless this be shown, the appellant must fail to obtain relief which he could not have had in an action at law. Fraud is rarely open, visible, or susceptible of direct and positive proof. It is most usually a matter of inference, to be drawn from the actions and conduct of men who at the time are careful to cover up their purposes and intent to deceive so as to avoid detection and enjoy in safety the fruits of their wrong-doing. We are constrained, therefore, to review the facts in this case and determine for ourselves whether these support the findings and decree of the trial court.

First. Was the sale of the mines to Howell and his associates procured by means of fraud, participated in by Mayer, or acquiesced in by him with a knowledge of the facts? For the right solution of this question it is necessary that the true relations between Shirley, Palmer, and Mayer be ascertained and understood, as those relations existed prior to and during the negotiations which led to the contract of purchase. As we have before stated, the record discloses that Mayer, at the time of the contract of July 1, 1893, was but a part owner in the premises sold. Prior to that time he had given, together with his associates, an option to Palmer to purchase his interest. It is quite apparent that this option or bond was nothing more than an authorization to Palmer to find a purchaser, and for his services he was to receive a commission on the amount of the purchase money. Palmer was therefore the mere agent of Mayer and his associates in effecting the sale. It will also be remembered that Shirley obtained an option or bond from Palmer, and upon the strength of this began his negotiations with Howell, Henry, and their associate, which ultimately led to a sale of the property. The connection between Mayer, Palmer, and Shirley was close and intimate, and that between Mayer and Palmer continued to be of a confidential character after Palmer's option had expired, and during the subsequent negotiations between Mayer and Howell, and indeed so long as Palmer had anything to do with the property. It was admitted by both Palmer and Mayer that the former was to receive a commission of twenty-five per cent upon the purchase money derived from the sale; and it appeared, further, that he received this commission upon the amount received by Mayer in the purchase of the

mines.   The acts and conduct of Palmer and his knowledge
in the matter of the sale of the property became therefore the
acts, conduct, and knowledge of Mayer as his principal.   The
same is true of Shirley so long as the latter was acting as the
agent of Palmer and Mayer in effecting the sale, which con-
tinued, as the evidence shows, until about the 25th or 26th of
June, 1893.   That the report made by Ihne as to the value of
the mines was grossly inaccurate and misleading is abun-
dantly shown from the subsequent history of the property.
Instead of the average value of the ores being sixty-five dol-
lars per ton, as stated by Ihne, actual tests made by Shirley
while acting as manager of the Henrietta Mining and Milling
Company, and by Palmer under the contract of January 4,
1894, did not show that the ore would mill more than $7.50
per ton upon the average.   The character of this report must
have been due to the incompetency of Ihne or to a mistake
due to his carelessness and inattention, or the flattering re-
sults obtained by him must have been due to some deception
practiced by others in salting the samples taken from the
mines, or to the substitution of rich ore in place of the ores
actually taken from the property, or by some other method
of deception due to the connivance of others.   Nothing ap-
pears in the evidence other than the exaggerated nature of
the report, which impeaches Ihne's competency as an expert
on mines; nor does it appear anywhere that he had any motive
to make a report not justified by the facts.   Ihne's accounts
of his visits to the mines and examination of the same are, in
substance, that early in June, 1893, he went with Palmer to
the mines, and there met Shirley, Mayer, and the other own-
ers of the property; that he personally made an examination
of the various claims, and directed Slack, one of the owners,
and who was at the time the acting superintendent of the
property, where to break down the ores to be sampled, and
was present while this was done, saw that the same were
sacked and sent to the mill; that he also took samples for
assaying; after the samples had been sacked and sent to the
mill, the latter being distant from the mines about two miles,
he went to the mill, and remained there during the time the
ores were worked; that he had broken from the stopes, and
taken to the mill, in the neighborhood of eleven tons; that
after the same had been taken to the mill he decided to have

brought from a large pile of ore on the dump of a shaft on one of the properties two or three tons of lean ore, so that he might be sure that his mill test would not run too high, but Palmer, who was present, agreed to look for a team and see that the ore was delivered; that this was done, and the lean ore added to the ores which he had taken from the stopes. Ihne denied any misconduct on his own part, or any knowledge of any misconduct on the part of any of the owners of the property during the time he was making his examination and tests to determine the value of the property. Shirley testified upon this point that he was present at the mines during Ihne's examination, and that the ores were taken out by the Slacks under Ihne's directions and superintendency; that the ore was put on the dump, sacked, and taken to the mill, and dumped into a bin there; that Palmer was present during this time, but did not go into the mines, and made no suggestions as to points from which ore should be taken; that the plates at Jones's mill, where the ore was worked, were cleaned before the tests were made; that neither Palmer nor Mayer were at the mill during the run; that Ihne was there every day, with one exception, when Palmer took him over to Big Bug, to examine the water supply; that he (Shirley) remained at the mill, and saw that no ore went in but the ore hauled from the mines; that the millmen made the clean-up, but that he did not know the result of the test until subsequently informed by Howell and Henry. Palmer stated in his examination that he had nothing to do with taking samples preparatory to making the mill run, and also had nothing to do with the mill test; that Ihne was absent during the run one day when he rode with him to Big Bug to measure the water supply. He denied furnishing Ihne liquors or intoxicants while at the mine, and that the only connection he had with the matter of obtaining ore from the mines and securing the mill run was in getting a team for Ihne to go after the additional ore desired by the latter. One Ben Rybon testified that while the ore was being taken to the mill from the mines he had examined the same, and had made objection to the quality of the ore to Shirley, and that the latter had said that he had better go and see Slack at the mine and see about it; that he saw Slack and told him to send better ore to the mill, and that Slack had replied that he would attend to it; that

Shirley was at the mill during the running of the ore, and claimed to be superintending the same; that his interest in the matter grew out of the fact that he was to get a commission upon the sale of Slack's interest. J. R. Slack testified that he had taken the ore samples from the ledge under the direction of Ihne; that he took from ten to twelve tons from the Silverton and Yankee Girl claims; that he sacked the same and sent them to Jones's mill by his own teams; that a number of men assisted him in getting out the ore; he thought he took the average samples; he denied having seen Rybon at the mine when he was taking the samples; that the last two tons which were sent to the mill were taken from different places over the dump under his direction; and that at the time Ihne was not at the mine, but was at the mill. Mayer's testimony upon this point was to the effect that he had nothing to do with the mill tests or assays or with furnishing the ore; that he did not go to the mine while Ihne was there, and knew nothing about the mill test. The appellant, Henry, testified that in April, 1894, Palmer, in a trip from Big Bug to Prescott, admitted to him that Ihne's report was a fabrication and a lie; that Ihne had told him to send over to the mill some ore from each of the claims; and that he was not going to miss the sale, and was very particular to see that he got good ore. This conversation was wholly denied by Palmer.

The foregoing constitutes, in effect, the evidence bearing upon the fraudulent nature of Ihne's report, and to what extent Mayer or any of his agents were concerned in the fraud, if any there was. There is enough to justify a suspicion, at any rate, that Ihne was deceived in some way in the value of the ores in the mines. It is also apparent that there was abundant opportunity on the part of either Shirley, Palmer, or Slack to have substituted rich ores in place of those actually taken from the stopes. We cannot say, however, from this evidence, that such a case is made out as would warrant us in holding contrary to the findings of the trial court upon this point, and in saying that Mayer or his agent, Palmer, participated in the fraud, if any there was, or had a knowledge that the same was perpetrated. The record is silent upon the question as to whether Mayer or Palmer knew of the results of the mill test, or had any knowledge as to the character of Ihne's report to Howell and his associates.

Upon the second ground of complaint—namely, that How-
ell and his associates were deceived by Palmer and Mayer as
to the amount of commission which the former was to receive
from the latter, and thereby deceived as to the true amount of
purchase money—there can be little or no doubt. Howell,
Henry and Bradshaw testified that Palmer on numerous occa-
sions prior to the contract and subsequent to the contract
stated that he was to receive a commission of five thousand
dollars in all. They likewise stated that Shirley so repre-
sented the matter of Palmer's commission at the time he was
negotiating for the sale of the properties in Chicago under
his option from Palmer. Howell testified that during the
negotiations for the purchase of the mines conducted by him-
self, which led to the contract of July 1, 1893, both Mayer
and Palmer had stated to him that there was to be no other
commission except the sum of five thousand dollars to Palmer.
It was also admitted by both Palmer and Mayer that the
actual commission to be received by Palmer was twenty-five
thousand dollars. Mayer testified that Palmer received
twenty-five per cent of the moneys paid to him under the
contract of purchase. Does this statement amount to such a
fraudulent representation as to the true purchase price as
would entitle the appellant to a relief against the enforcement
of the full purchase price by Mayer under the terms of the
contract of sale? It was held in the case of *Van Epps* v. *Har-
rison,* 5 Hill, 63, "that a fraudulent representation made by
the vendor as to price he paid for the land entitled the vendee
to recoup for the damages occasioned by the fraud in an
action on the bond given for the price." Howell also testi-
fied that Palmer represented that one hundred thousand dol-
lars was the lowest price at which the property could be
bought, notwithstanding the fact that Mayer, as it appears,
was willing and anxious to obtain thirty thousand dollars for
his interest in the property, and that the whole could have
been bought at the time of the Howell contract for the sum
of sixty thousand dollars. We think, in equity, the true pur-
chase price of the property should be held not to be one hun-
dred thousand dollars, as named in the contract, but this
amount less the fraudulent commission agreed upon between
Palmer and Mayer, and the amount due from appellant as
the subrogee of the Henrietta Mining and Milling Company,

should be decreased by twenty thousand dollars, the amount of said fraudulent commission.

Third. The nominal parties to the contract of January 4, 1894, were Mayer, Howell, and the Henrietta Mining and Milling Company. The real contracting parties were Mayer and Henry. Howell after the organization of the company became its president and general manager. Henry, as found by the court, and as shown by the evidence, furnished all the money used by the company from his individual resources, and at the time of the execution of the contract owned practically all of the stock of the company. In December, 1893, Henry visited Prescott and found that the affairs of the company were in a bad way, with debts to the amount of thirty-three thousand dollars chargeable against it. Palmer urged him to pay off this indebtedness and get rid of Howell, as the latter was unpopular with the creditors of the company and unsatisfactory in his relations with the company, and promised, should Henry do this, to use his own language, to "pull off his coat and go to work, and pull Henry out of the hole." Palmer also represented that the property could be made to pay sufficiently to clear off the balance of the purchase money due to Mayer. In accordance with Palmer's advice, Henry bought out Howell as well as Shirley and Webber, and arranged to pay the thirty-three thousand dollars indebtedness. He then began negotiations with Mayer, through Palmer, to arrange for an extension of time for the payment of the unpaid purchase money, and, as a result of these negotiations and the representations made by Palmer, the contract of January 4th was entered into. Palmer then went into the possession of the property and began work. Under his management the property was operated at a loss from the start. Notwithstanding this, Palmer kept Henry in ignorance of the true condition of affairs, and, it is quite evident, purposely deceived him until the debts had accumulated to such an extent that further concealment was impossible. He further exhibited bad faith in turning the property over to Mayer without notifying the company or Henry of his intention to do so. Mayer during this time had full opportunity and full right under the agreement to know just what was being done by Palmer. The confidential relations existing between Palmer and Mayer render improbable the as-

sumption that Mayer could have been in ignorance of the results of Palmer's management, and his subsequent conduct in promptly taking possession of the property, and claiming the same under the forfeiture clause of the contract, is sufficient to justify the belief that he as well as Palmer was lacking in good faith in the premises; for they must have known at the time of the execution of the contract of January 4th that its performance was impossible; that the payment to Mayer of one half of the gross proceeds would not leave a margin sufficient to keep the property working; that debts would accumulate, and the company be embarrassed to such an extent that the interest of Henry and the company would be sacrificed. Both knew and understood that Henry was inexperienced in the mining business. They both knew, too, that Palmer's statements as a miner admittedly competent and experienced would have great weight with Henry, and that the latter would therefore be apt to confide in Palmer's statements of his ability to make the property pay under the agreement. We are persuaded that Henry was induced to enter into the agreement of January 4th, and to clear the property of the thirty-three-thousand-dollar debt, and thus put himself in a worse situation with reference to the purchase of the property than he otherwise would have been in, because of the representations of Palmer, and that at the time Palmer was Mayer's accredited agent. Under this view of the case we do not think that Mayer's taking possession in June, 1894, was rightful or warranted, and that in so far as the decree recognizes Mayer's right to the possession of the property it was erroneous.

Fourth. Again, we think the decree is erroneous in holding that Mayer was entitled to the possession under his contract of the mill and machinery which the evidence shows to have been constructed by the Henrietta Mining and Milling Company on property which was never owned by Mayer or his associates, but which had been located by the company after the contract of July 1, 1893. By no principle of law that we are aware of can real estate be forfeited to another which the other has never owned and to which he has no title because of a failure to pay for property which the vendor did own and to which he did have title. Forfeitures are not enforced in equity and are not favored in law. Notwithstand-

ing the clause in the contract of July 1, 1893, to the effect that upon failure of the vendee to comply with the terms of his purchase said failure should work a forfeiture of the rights of the vendee under the contract, and of the money which he should have paid, and all of the improvements by him placed on or adjacent to said mines, including said mill and all of its connections, and all of said mines, water-rights, and so forth, should belong to and become the absolute property of the vendor, equity will not enforce a condition so at variance with any principle of fairness and justice. The decree should provide that the mill and machinery constructed by the company on property not the subject of contract and sale between the parties on July 1, 1893, be the property of the appellant, as subrogee to the rights of the Henrietta Mining and Milling Company.

We conclude from a review of the facts and circumstances proven in the case that the findings of the trial court should be modified in these respects: 1. That the true purchase price of the property, instead of being one hundred thousand dollars, as found by the trial court, was the sum of eighty thousand dollars; and 2. That there was due at the time of the rendition of the decree the sum of $19,525, instead of the sum of $39,525, as was found by the trial court. We have reached the further conclusion that the trial court should have found that the taking possession of the property by Mayer was not warranted, but that the appellant, George W. Henry, as the subrogee of Spooner R. Howell, the Henrietta Mining and Milling Company, James Shirley, L. J. Webber, and Frank M. Bradshaw, was and is entitled to the immediate possession of the same, and that the appellee Mayer has acquired no right, title, or interest in and to the mill and other property not included within the contract of sale of July 1, 1893. We conclude, further, that a decree should be entered adjudging and decreeing that appellant, George W. Henry, be subrogated to all the rights of Spooner R. Howell, the Henrietta Mining and Milling Company, James Shirley, L. J. Webber, and Frank M. Bradshaw, under and by virtue of the contracts set forth in the complaint in the action for the purchase of the American Flag, Yankee Girl, Invincible, Silverton, and Germania mining claims, situated in the Big Bug Mining District, Yavapai County, Arizona; and that the

appellee Joseph Mayer be required to account for all moneys received by him from the sale of ores, bullion, concentrates, or other products derived by him from said mines from the time of his taking possession of the same until he surrenders the possession as hereinafter provided; and if it be found from said accounting that he has derived profit from the working and operation of said mines, the amount of said profit should be deducted from the amount due him under his contract of sale, dated July 1, 1893. The decree should further provide that the appellant, as the subrogee of Howell, the Henrietta Mining and Milling Company, Shirley, Webber, and Bradshaw, be put into immediate possession of all of said property, mill, and machinery; and that when it has been ascertained from said accounting how much, if any, of the balance of the $19,525 remains unpaid of said purchase money, said appellant be given ninety days within which to pay the same; and in case he shall so elect, and shall pay said balance, the appellee Joseph Mayer be decreed to make, execute, and deliver to appellant a good and sufficient deed conveying to said appellant said mining properties,— to wit, the American Flag, Yankee Girl, Invincible, Silverton, and Germania mining claims,—being the same property described in the complaint in the action. It should further be decreed that in case said appellant do not pay said unpaid balance within the said ninety days, a master be appointed by the court to sell said mining claims in the manner provided by law for the sale of real property under execution, and that from the proceeds derived from said sale said unpaid balance of the purchase money shall first be paid to said Mayer, and the balance thereof be paid to appellant, George W. Henry; that said sale be subject to any and all liens which any creditor or creditors of said Henrietta Mining and Milling Company may have or obtain against said property; that said master be authorized to make a good and sufficient deed to the purchaser at said sale, upon the approval of the same by the trial court. The judgment and decree are reversed, and the court below is hereby instructed and directed to enter its decree in accordance herewith.

Street, C. J., Doan, J., and Davis, J., concur.