196 P.3d 863

In the Matter of the ESTATE OF
Celia J. NEWMAN, Deceased.

Adina M. Newman, as Personal Represen-
tative of the Celia J. Newman Estate
and Successor Co–Trustee of the Celia J.
Newman Trust, Petitioner/Cross–Defen-
dant/Appellee,

and

Ilana Newman, Co–Trustee of the Celia
J. Newman Trust, Third–Party
Defendant/Appellee,

v.

Mordecai M. Newman, Respondent/Cross–
Claimant/Third–Party
Plaintiff/Appellant.

No. 1 CA–CV 07–0373.

Court of Appeals of Arizona,
Division 1, Department B.

June 12, 2008.

As Amended July 17, 2008.

Review Denied Oct. 28, 2008.

Fennemore Craig, P.C. By Louis F. Comus, Jr., Roger T. Hargrove, Alexandra R. Arpad, Phoenix, Attorneys for Appellees/Petitioners Adina Newman as Personal Representative and Co–Trustee, and Ilana Newman as Co–Trustee.

Marlene Appel, Attorney at Law, Phoenix, Attorney for Appellee Adina M. Newman Individually.

Kenneth L. Abrams, PC By Kenneth L. Abrams, Phoenix, Attorney for Appellee Adina M. Newman as Personal Representative.

Snell & Wilmer, L.L.P. By Kevin J. Parker, Phoenix, Attorneys for Appellant Mordecai M. Newman.

**OPINION**

BARKER, Judge.

¶ 1 In this probate proceeding, we are asked to review the trial court's division of assets among the decedent's three children.

### Facts and Procedural Background

¶ 2 Celia Newman ("Celia") died on August 30, 2004. She was survived by three children, Ilana Newman ("Ilana"), Adina Newman ("Adina"), and Mordecai Newman ("Max"). Pursuant to the terms of Celia's will, Adina was appointed personal representative of her estate. Adina and Ilana were also appointed trustees of the trust owned by Celia prior to her death.

¶ 3 We consider the facts in the light most favorable to sustaining the trial court's judgment. *Pelletier v. Johnson,* 188 Ariz. 478, 480, 937 P.2d 668, 670 (App. 1996). While administering Celia's estate, Adina became aware of several questionable financial transactions involving Celia and Max that had occurred in the years preceding Celia's death, while she was physically and mentally impaired. Specifically, in late October 2002, Max had used $93,000 of Celia's money as a down payment toward the purchase of a home in Scottsdale. Max testified that he left his job in San Francisco and moved to Phoenix to help care for Celia. Max claimed that he and Celia had intended to live in the house, which they owned as joint tenants with rights of survivorship. However, Celia never moved into the Scottsdale home. Max's testimony was also inconsistent with that of Celia's sister-in-law, Sarah Newman, as to when he moved into the home. Before trial, he testified in a deposition that he did not move in until after Celia's death. Sarah Newman testified that he moved in soon after the home was purchased.

¶ 4 Max also had withdrawn $185,000 in late August 2004 and $117,800 in April 2004 from Celia's Morgan Stanley Individual Retirement ("IRA") account. He deposited these funds into a bank account that he shared with his mother with rights of survivorship. Though he later claimed to be unaware that he would have ownership of these funds after Celia died, the trial court found

his testimony to be inconsistent and not credible, given that he had been trained as a financial advisor at Morgan Stanley. Max claimed that some of the $185,000 was used for Celia's expenses, although he kept no records that would allow the court to determine whether some of the funds were used for his own benefit. In October 2003, Max also had acquired a power of attorney to act on his mother's behalf. He used this power to sign his mother's name to various financial documents, at times without noting that he was signing on her behalf. A few days before his mother's death, Max drafted and signed documents purporting to disinherit Adina from the trust and revoke the designation of Adina as a personal representative of the trust.

¶ 5 As a co-trustee and personal representative of her mother's estate, after learning of these transactions, Adina asked Max to return the $185,000 to Celia's IRA in order to avoid unnecessary income taxes. He refused. She also asked that he cooperate with the administration of the estate by providing additional information about his role in Celia's financial affairs. Max provided some documents, but otherwise failed to comply. He also attempted to remove Adina as a personal representative and trustee of his mother's estate, filing a Petition to Remove in the trial court.

¶ 6 In response to Max's lack of cooperation, Adina brought the following claims against him: (1) return of property and documents in aid of administration (Arizona Revised Statutes ("A.R.S.") section 14–3709), (2) breach of fiduciary duty/constructive trust, (3) breach of statutory duty under Arizona's Vulnerable Adults Statute (A.R.S. § 46–456), (4) conversion,[1] and (5) reformation. In response, Max filed a counterclaim accusing Adina of defamation and wrongful recording of *lis pendens*. He also filed a counterclaim for breach of fiduciary duty against both Ilana and Adina.

¶ 7 The trial court set trial only on Adina's Petition to Recover Assets and Max's Petition to Remove Co–Trustee. Though not

expressly stated, the result of the court's order meant that the other claims were reserved for subsequent proceedings or disposition. Prior to trial, Max moved to transfer the case to the Probate Presiding Judge. He also demanded a jury trial. In addition, he moved to exclude his sisters' expert witnesses, claiming that they had been untimely disclosed. The trial court ultimately denied all these requests.

¶ 8 After a seven-day trial, the trial court found that Max failed to meet applicable fiduciary standards and that he was liable to Celia's estate for sanctions and for the benefits he received prior to her death. The trial court entered one judgment for $185,000, reflecting the amount of money Max withdrew from Celia's IRA in August 2004. The court also entered a second judgment in the amount of $518,106. Based on the description in the proposed form of judgment, the trial court arrived at $518,106 by adding $93,000 for the Scottsdale house down payment, $278,000 for double damages pursuant to A.R.S. § 14–3709(D), $61,050 for tax damages, and $86,056 for prejudgment interest (calculated at 10% per annum) based on the corresponding amounts set forth in Adina's proposed form of judgment. The double damages were calculated by adding $93,000 (for the Scottsdale house down payment) and $185,000 (the IRA withdrawal). The trial court also left open further unspecified amounts to be determined by an accounting.

¶ 9 Pursuant to Arizona's Vulnerable Adults Statute, A.R.S. § 46–456, the court also found that Max was required to forfeit the benefits he would have received under Celia's will. Since Celia's estate poured over into her trust, the court also found that Max forfeited all benefits accruing to the trust after Celia's death, while leaving intact benefits due Max under the trust independent of the will.

¶ 10 Max timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).[2]

---

1. Adina later withdrew the conversion claim.

2. There being on-going proceedings in this matter. Generally, appellate court jurisdiction is

"limited to final judgments which dispose of all claims and all parties." *Musa v. Adrian,* 130 Ariz. 311, 312, 636 P.2d 89, 90 (1981); *see also*

*Discussion*

¶ 11 On appeal, Max raises eleven issues, which we have grouped into three major categories: (1) issues relating to the merits of the trial court's decision, (2) issues relating to the trial court's decisions regarding scheduling and the mode of trial, and (3) issues relating to the trial court's evidentiary rulings on the admissibility of expert opinions. We discuss each in turn.

## I. The Merits

¶ 12 Max argues that the trial court misinterpreted two statutes (A.R.S. §§ 14–3709, 46–456), erred by refusing to appoint an independent trustee and representative, and made clearly erroneous findings of fact.

¶ 13 We apply a de novo standard of review to the trial court's legal conclusions. *P.M. v. Gould,* 212 Ariz. 541, 544, ¶ 12, 136 P.3d 223, 226 (App.2006). However, the trial court's "factual findings must be accepted on appeal unless they are 'clearly erroneous.'" *Davis v. Zlatos,* 211 Ariz. 519, 523, ¶ 18, 123 P.3d 1156, 1160 (App.2005) (quotation omitted).

A.R.S. § 12–2101(B) (2003) (authorizing appeals from "a final judgment entered in an action ... commenced in a superior court"). An exception to this rule exists under Arizona Rule of Civil Procedure 54(b) when the trial court "direct[s] the entry of final judgment as to one or more but fewer than all of the claims or parties ... upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Here, Max's counterclaims were excluded from trial and are still outstanding (see *infra* ¶¶ 60 to 63). However, the trial court expressly found that there was "no just reason for delay" and directed the entry of judgment ("the Court hereby enters the following Judgment"), thus falling within the Rule 54(b) exception. Neither party contends that this Rule 54(b) finding was in error. Neither do we find error in our independent review of whether appellate jurisdiction is appropriate.

3. Section 14–3709 in total provides as follows:
A. Except as otherwise provided by a decedent's will, every personal representative has a right to, and shall take possession or control of, the decedent's property, except that any real property or tangible personal property may be left with or surrendered to the person presumptively entitled to it unless or until, in the judgment of the personal representative, possession of the property by the personal representative will be necessary for purposes of

## A. A.R.S. § 14–3709

¶ 14 This case presents the narrow question of whether a necessary prerequisite to an award of double damages under A.R.S. § 14–3709(D) is a prior court order with regard to the property at issue. Max argues that the language of the statute requires such an order. We agree.

¶ 15 The first step in statutory construction is to "look to the language of the statute itself. Our chief goal is to ascertain and give effect to legislative intent." *Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin.,* 206 Ariz. 1, 5, ¶ 10, 75 P.3d 91, 95 (2003) (citation omitted). We must consider "each word, phrase, clause, and sentence ... so that no part will be void, inert, redundant or trivial." *Williams v. Thude,* 188 Ariz. 257, 259, 934 P.2d 1349, 1351 (1997) (quotations omitted, emphasis removed).

¶ 16 It is impossible to appropriately consider the double-damages provision in subsection (D) without considering subsections (A), (B), and (C).[3] A.R.S. § 14–3709. We

administration. The request by a personal representative for delivery of any property possessed by an heir or devisee is conclusive evidence, in any action against the heir or devisee for possession of the property, that the possession of the property by the personal representative is necessary for purposes of administration. The personal representative shall pay taxes on, and take all steps reasonably necessary for the management, protection and preservation of, the estate in the personal representative's possession. [T]he personal representative may maintain an action to recover possession of property or to determine its title.
B. If the personal representative or other person interested in the estate of a decedent complains to the court, on oath, that a person is suspected of having concealed, embezzled, conveyed or disposed of any property of a decedent, or possesses or has knowledge of deeds, bonds, contracts or other writings which contain evidence of or tend to disclose the right, interest or claim of a decedent to any property, or the will of a decedent, the court may cite that person to appear before the court and may examine that person on oath on the complaint. If that person is not in the county where letters have been issued, the person may be cited and examined before the court in the county where the person is found or the court issuing the citation. If the person appears and the court determines that the claim is unfound-

note first that subsection (A) provides for a personal representative to "take possession or control of[ ] the decedent's property." *Id.* It further provides that "[t]he request by a personal representative for delivery of any property possessed by an heir or devisee is conclusive evidence, in any action against the heir or devisee for possession of the property, that the possession of the property by the personal representative is necessary for purposes of administration." *Id.* Subsection (A) further provides that "[t]he personal representative may maintain an action to recover possession of property or to determine its title." *Id.*

¶ 17 Subsections (B), (C) and (D) of § 14–3709 pertain to circumstances when a personal representative, or other interested person, believes that a person has, among other things, concealed, embezzled, conveyed or disposed of property of the decedent. Subsection (B) provides that "the court may cite that person" to appear before it. Subsection (C) provides for a sanction of jail if the cited person refuses to appear or answer relevant questions. Subsection (D) sets forth the protocol for the hearing on whether an order of disclosure will issue. Such an order is to be granted "[i]f on examination or from other evidence adduced at the hearing it appears that a person has concealed, embezzled, conveyed or disposed of any property of a decedent." [4] *Id.*

¶ 18 Subsection (D) also specifies the effect given to an order of disclosure. It states that "[t]he order for the disclosure made on

this examination is prima facie evidence of the right of the personal representative to the property in an action brought for recovery of that property, and a judgment shall be for double the value of the property or for return of the property" plus damages of the same amount. *Id.* This passage makes it clear that the application for an order of disclosure is not the "action to recover possession of the property or to determine its title" authorized under subsection (A). This is so because subsection (D) provides that the order of disclosure is "prima facie evidence" of the right of the personal representative to the property "in an action brought for the recovery of that property." Additionally, the language of subsection (D) links the entitlement to double damages to an action brought for the recovery of the property which is based upon a prior order for disclosure.

¶ 19 Thus, as we read § 14–3709(A)–(D), we conclude that the language of the statute sets up a process whereby a personal representative may commence an "action to recover possession of property," authorized by subsection (A). Before the trial on that action, subsection (D) authorizes a process by which the personal representative may obtain an order of disclosure against an individual believed to have wrongfully "concealed, embezzled, conveyed or disposed of" property. § 14–3709(D). That order, if obtained, may be used in the subsection (A) trial to recover the property. At trial, the personal representative may obtain a judgment for double

---

ed, the court shall allow that person necessary expenses out of the estate.

C. If the person cited as provided by subsection B refuses to appear and submit to an examination, or to answer questions relevant to the complaint, the court may commit that person to jail until the person submits to the order of the court or is discharged according to law.

D. If on examination or from other evidence adduced at the hearing it appears that a person has concealed, embezzled, conveyed or disposed of any property of a decedent, or possesses or has knowledge of deeds, bonds, contracts or other writings tending to disclose the right, interest or claim of a decedent to any property, or the will of a decedent, the court may order that person to turn over the documents or disclose knowledge to the personal representative and may commit the person cit-

ed to jail until the order is complied with or the person is discharged according to law. The examination shall be reduced to writing and filed in court. The order for the disclosure made on this examination is prima facie evidence of the right of the personal representative to the property in an action brought for recovery of that property, and a judgment shall be for double the value of the property, or for return of the property and damages in addition to the property equal to the value of the property. The court may also award reasonable attorney fees and costs.

4. In *In re Jorgenson*, as we discuss subsequently, we clarified that the conveyance or disposal of the property must have some wrongful or bad faith element before double damages may be imposed. 159 Ariz. 214, 216, 766 P.2d 87, 89 (App.1988).

the value of the property in the event it succeeds on the action to recover, including proof of the wrongful conduct which formed the basis of the order of disclosure.

¶ 20 Our analysis is substantiated in two regards by the legislative history pertaining to § 14–3709. *In re Marriage of Waldren,* 217 Ariz. 173, 176, ¶ 15, 171 P.3d 1214, 1217 (2007) (utilizing legislative history to support a conclusion drawn from the language of the statute). First, when the legislature originally enacted § 14–3709 it contained only subsection (A). *See* Laws 1973, ch. 75, § 4, effective January 1, 1974. It was not until 1976 that subsections (B), (C), and (D) were added. *See* Laws 1976, ch. 92, § 26. This supports the interpretation that two separate procedural events were contemplated: (1) an action permitted by subsection (A) by the personal representative for the recovery of property, and (2) a proceeding similar to a preliminary hearing, if you will, pursuant to subsections (B), (C), and (D) whereby the court could issue an order if it appeared that an individual had embezzled or otherwise is implicated by the terms of subsections (B), (C), and (D).

¶ 21 Secondly, and most importantly, the legislative history as to subsections (B), (C), and (D) supports the interpretation that a prior court order is necessary to obtain double damages as provided in subsection (D).

Prior to the adoption of subsections (B), (C), and (D) in 1976, there were two related statutes in place.[5] These statutes, § 14–544 (1956) and § 14–545 (1956), had been present in our statutes in some form since at least the 1939 edition. 1939 Ariz.Code §§ 38–812, –813. Immediately prior to the adoption of subsections (B), (C), and (D) in 1976, A.R.S. § 14–545 (1956) provided for double damages after an order of disclosure had been obtained.[6] That statute is almost identical to the current version of § 14–3709(B), (C), and (D) (2005). On the other hand, A.R.S. § 14–546 (1956) provided for double damages without the prior issuance of an order of disclosure.[7] None of the statutory language from A.R.S. § 14–546 (1956) was included in the current version of § 14–3709(B)–(D) (2005). It seems clear that the legislature had two competing statutory methods to obtain double damages. By enacting the original version of § 14–3709 and by its amendment in 1976, it chose the method from § 14–545 (1956) (which required a predicate order from the court) and did not choose to adopt A.R.S. § 14–546 (1956) (which required no predicate order).

¶ 22 Applying basic principles of statutory construction, it would be inappropriate for this court to incorporate into a current statute language which had been eliminated from the predecessor statute. *See State v.*

---

5. As noted in the preceding paragraph, the effective date of A.R.S. § 14–3709 was January 1, 1974. Only subsection (A) was enacted at that time. Laws 1973, ch. 75, § 4. Until January 1, 1974, A.R.S. §§ 14–544, and –545 (1956) remained in effect. *Id.* §§ 1, 3.

6. The full text of A.R.S. § 14–545 (1956) is as follows:

A. If the person cited as provided by § 14–543 refuses to appear and submit to an examination, or to answer questions relevant to the complaint, the court may commit him to jail until he submits to the order of the court or is discharged according to law.
B. If, upon examination, or from other evidence adduced at the hearing, it appears that he has concealed, embezzled, conveyed or disposed of any property of decedent, or that he has in his possession or knowledge deeds, bonds, contracts or other writings tending to disclose the right, interest or claim of decedent to any property, or the will of decedent, the court may order him to disclose knowledge

thereof to the executor or administrator, and may commit him to jail until the order is complied with or he is discharged according to law. The examination shall be reduced to writing and filed in court.
C. The order for the disclosure, made upon such examination, is prima facie evidence of the right of the executor or administrator to the property in an action brought for recovery thereof, and a judgment recovered therein shall be for double the value of the property, or for return of the property and damages in addition thereto equal to the value of the property.

7. It provided as follows:

If any person before granting of letters testamentary or of administration embezzles or alienates any property of a decedent, he is chargeable therewith and liable to an action by the executor or administrator of the estate for double the value of the property embezzled or alienated to be recovered for the benefit of the estate.

*Morse,* 127 Ariz. 25, 30, 617 P.2d 1141, 1146 (1980) ("The elimination of language concerning intent from Arizona's statute prohibiting receipt of stolen property indicates that the Legislature intended to remove that element from the offense."); *State v. Thomas,* 217 Ariz. 413, 419, ¶ 23, 175 P.3d 71, 77 (App. 2008) ("The 'decision to delete language ... is strong evidence that [the] Legislature did not intend [the] omitted matter should be effective.' ") (quoting *Stein v. Sonus USA, Inc.,* 214 Ariz. 200, 203, ¶ 11, 150 P.3d 773, 776 (App.2007)); *Gravel Resources of Arizona v. Hills,* 217 Ariz. 33, 37, ¶ 11, 170 P.3d 282, 286 (App.2007) (explaining that the deletion of statutory language strongly implies that it should no longer be effective; "[i]n our view, the Legislature made it clear by deleting the omitted language that the lack of an adequate legal remedy is no longer a requirement for obtaining the appointment of a receiver."); *State v. Weinstein,* 182 Ariz. 564, 567, 898 P.2d 513, 516 (App.1995) (explaining that because "the 1977 legislature deleted this language from the extortion statute[,]" the court could not "read into this statute language that the legislature intentionally and specifically excluded"). Thus, in addition to the statutory language itself, this is a second reason supporting our conclusion that double damages under § 14–3709(D) require a prior court order.

¶ 23 Adina argues that the requirement of a predicate court order is inconsistent with *In re Jorgenson,* 159 Ariz. 214, 766 P.2d 87 (App.1988). We disagree. *Jorgenson* dealt with an issue different from the one we have here. In *Jorgenson,* the question was whether there must be some wrongful conduct in order to award double damages pursuant to subsection (D). *Id.* at 214, 766 P.2d at 89. In that case, the personal representative filed an action for recovery of property and double damages based on subsection (D). *Id.* The case was tried to a jury. *Id.* at 215, 766 P.2d at 88. The jury was given no instruction that required them to make any finding of wrongful conduct in order for double damages to be awarded. We stated: "double damages are authorized only when the defendant in an action to recover property has wrongfully

concealed, embezzled, conveyed or disposed of property and not when the defendant honestly but mistakenly believed the property belonged to him." *Id.* at 216, 766 P.2d at 89.

¶ 24 We agree entirely with *Jorgenson.* Wrongful or bad faith conduct is required pursuant to § 14–3709(D), though not expressly stated. We were not, however, presented in *Jorgenson* with the issue of whether the language of § 14–3709(D) also required a prior court order relative to the conduct at issue before double damages could be imposed as a sanction.

¶ 25 As a policy matter, our interpretation also protects the due process rights of individuals to property in their possession. Under the interpretation we render, double damages may not be assessed without a hearing noticed pursuant to A.R.S. § 14–3709(D). If a person charged with violating the terms in subsection (D) fails to turn over the required information prior to the hearing, that person may be subject to an award of double damages. This notice provision gives the accused person the opportunity to provide the information, without penalty, prior to the hearing. This provides some due process protection. On the other hand, we do not hold that a person so charged may avoid double damages by complying with the court's order of disclosure issued *after* the subsection (D) hearing but prior to trial as provided under subsection (A). The *violation* of an order pursuant to subsection (D) is not required for double damages to be awarded. The language of subsection (D) does not provide for such a result. Neither would it be consistent with our policy of promoting "the just, speedy, and inexpensive determination of every action" to do so. *See* Ariz. R. Civ. P. 1. Such a practice would encourage those charged to delay producing information about property presumed to be a part of the estate until after a hearing had occurred and an order issued. Thus, the interpretation we give provides the due process protection of notice but permits the punitive sanction of double damages to discourage unwarranted delay in producing information in the event an order of disclosure is issued.[8]

---

8. Obviously, a person charged pursuant to sub-

section (D) avoids the prospect of double dam-

¶ 26 For the foregoing reasons we hold that double damages pursuant to A.R.S. § 14–3709(D) may be awarded only after issuance of an order of disclosure as to the property or conduct at issue, but that no violation of the order is required before double damages may be imposed. As the statute provides, that order is prima facie evidence of the wrongful conduct or bad faith set forth in the order. In order to obtain double damages, the personal representative then must prove at trial, consistent with *Jorgenson*, that the wrongful conduct took place.

¶ 27 Because no such prior order existed here, we vacate the trial court's award of double damages against Max. Specifically, we strike the $278,000 portion of the $518,106[9] award that was based on double damages for (1) the $185,000 IRA withdrawal and (2) the $93,000 for the Scottsdale house down payment. We remand to allow the trial court to recalculate prejudgment interest on the remaining $154,000.

### B. A.R.S. § 46–456

¶ 28 Max argues that the trial court misinterpreted Arizona's Vulnerable Adults Statute, A.R.S. § 46–456, by applying subsection (A)'s trustee duties to family members. He also argues that the trial court erred in finding that forfeiture was automatic and mandatory once the statute was violated. Finally, he contends that the trial court erred in applying the provisions of this statute to Celia's trust. We reject these arguments.

### 1. Family Members

¶ 29 As to the applicability of § 46–456(A)'s trustee duties to family members, we note that the forfeiture provisions of A.R.S. § 46–456(D) specify that they apply to a violation of § 46–456(A) ("[a] person who violates subsection A or B of this section"). We further note that subsection D provides that the forfeiture applies to "an intestate share, an elective share, an omitted spouse's share, an omitted child's share, a homestead allowance, an exempt property allowance and a family allowance." A.R.S. § 46–456(D). These are inheritance rights and allowances that *only* apply to family members. Thus, it would make little sense to construe subsection A to not apply to family members. The legislative history of this statute further supports this interpretation. Discussion of House Bill 2457 & Attachment 8 thereto, Minutes of Banking & Insurance Committee, Arizona House of Representatives, 42nd Legislature, 2nd Regular Session (Feb. 13, 1996) at 5, 6 ("[B]asically this bill is aimed at *family* and friends who take advantage of a vulnerable adult. Oftentimes the 'bad guys' are family members . . . .") (emphasis added).

### 2. Whether Forfeiture Is Automatic

¶ 30 Turning to the argument that the trial court erred in finding that forfeiture was automatic, we consider that the trial court did not find, as Max asserts, that a child who helps a parent and "receives *any* benefit" would be automatically subjected to treble damages and forfeiture of all inheritance rights pursuant to § 46–456(C), (D).

¶ 31 Under the plain language of the statute, the forfeiture is mandatory and automatic if a violation of the statute is found. An individual who violates the statute "is subject to" treble damages, § 46–456(B), and "forfeits all benefits" in the decedent's estate, § 46–456(D). Here, the record supports the trial court's finding of a violation of § 46–456(A).

¶ 32 Under A.R.S. § 46–456, once a person is found to occupy a "position of trust or confidence" with regard to "an incapacitated or vulnerable adult," the person in the position of trust and confidence is required to act for the benefit of the vulnerable adult to the same extent as a trustee under Arizona law. *Davis v. Zlatos*, 211 Ariz. 519, 524, ¶ 20, 123 P.3d 1156, 1161 (App.2005). As the *Davis* court explained,

ages if he or she prevails at the hearing and no order of disclosure issues.

9. The $518,106 was originally calculated as follows:

| | |
|---|---|
| $ 93,000 | (Scottsdale house down payment) |
| $278,000 | (Double damages under § 14-3709(D)) |
| $ 61,050 | (tax damages) |
| $ 86,056 | (prejudgment interest at 10% per annum) |
| $518,106 | TOTAL |

At the very least, a prudent trustee dealing with Mrs. Zlatos's assets would have advised her to seek the help of a family member or lawyer in making such transfers. If Mrs. Zlatos still wished to make the transfers after receiving independent advice ... Saenz could not be faulted for accepting her generosity. Instead, Saenz simply and quietly accepted the money and the property from Mrs. Zlatos. In doing so he profited from such transactions to Mrs. Zlatos's detriment.

*Id.* at 527, ¶ 34, 123 P.3d at 1164.

■ ¶ 33 Here, although there was conflicting evidence, the factual record supports the trial court's determination that Celia was "an incapacitated or vulnerable adult." For instance, Dr. Willson testified that "as early as 2002, she was being described as someone who couldn't be left alone[, and that she] [n]eeded to have twenty-four hour care." She testified that beginning in Fall 2002, Celia's "cognitive ability was consistently diminished." She also testified that there was "a high likelihood" that "[Celia] didn't fully understand what she was signing" when she co-signed for the Scottsdale house in October 2002.

¶ 34 The record also shows that Max was in a position of trust and confidence with respect to Celia. In A.R.S. § 46–456(G)(3)(b), "position of trust and confidence" is defined to include "a joint tenant or tenant in common with an incapacitated or vulnerable adult." It is undisputed that Max was a joint tenant with Celia as to an account at Bank of America as well as the Scottsdale house.

■ ¶ 35 Given that the two threshold elements are met, Max had an affirmative duty to "act for the benefit of [Celia] to the same extent as a trustee." A.R.S. § 46–456(A). Max breached this duty by failing to keep clear and accurate records, commingling funds, and engaging in transactions that benefitted him without advising Celia to seek the help of a family member or lawyer. Thus, there was no error in the trial court's determination that forfeiture was mandatory.

### 3. The Scope of the Forfeiture

■ ¶ 36 Max also argues that the trial court inappropriately forfeited not only Max's interest in the will but his interest in Celia's trust. We disagree.

¶ 37 We first note that the trial court did not forfeit Max's interest in trust benefits that arose independently of the will. The trial court stated:

194. Although the Court does not interpret A.R.S. § 46–456(D) to require forfeiture of all benefits with respect to a trust estate, it would be anomalous for Max to forfeit all benefits with respect to Celia's probate Estate, and then receive the same benefits through Celia's Trust. This is especially true because the primary assets of the probate Estate will be the funds recovered from Max under the vulnerable adult statute.

Accordingly, the Court holds that Max remains a beneficiary of Celia's Trust with respect to the Trust as it was constituted prior to Celia's death, but that Max in his capacity as a beneficiary of Celia's Trust shall forfeit his interest in benefits accruing to the Trust from Celia's probate Estate.

Minute Entry dated 2/05/2007 p. 32, ¶ 194. We agree with the trial court's reasoning that it would be inappropriate for Max to recover trust benefits that he would only have received because of a bequest under the probate Estate which has been forfeited as a result of A.R.S. § 46–456(D). Thus, we find no error here.

### C. Removal of Trustee and Representative

■ ¶ 38 Max argues that the trial court erred in denying his Petition to Remove and failing to appoint "a neutral, independent personal representative." We disagree.

■ ¶ 39 In Arizona, like most states, the decedent's preference for a personal representative is given great deference. *In re Lawrence's Estate*, 53 Ariz. 1, 4, 85 P.2d 45, 46 (1938) ("If it be determined that the deceased's choice of executor in his will was competent, it will not be necessary to consider the other two assignments. The law fa-

vors the upholding of the wishes of a testator ... when it can be done."). The record supports the trial court's determination that "the Personal Representative and the Trustees have acted in good faith at all times during this litigation, and have made every effort to be fair to Max despite his obstructive conduct" and that they had "requested guidance from the Court when Max questioned their actions." *See* Restatement (Third) of Trusts § 37, cmt. e(1) (2003) ("Friction between the trustee and some of the beneficiaries is not a sufficient ground for removing the trustee unless it interferes with the proper administration of the trust.").

¶ 40 That Max may have presented conflicting evidence on this issue is of no significance so long as there is evidence to support the trial judge's findings. Even if Max did present "substantial evidence in his favor on every material dispute," as he asserts, it is not the function of this court to reweigh the facts or to second-guess the credibility determinations of the judge who had the opportunity to evaluate the witnesses' demeanor and make informed credibility determinations. *In re Estate of Pouser*, 193 Ariz. 574, 579, ¶ 13, 975 P.2d 704, 709 (1999) ("In reviewing a trial court's findings of fact, we do not reweigh conflicting evidence or redetermine the preponderance of the evidence, but examine the record only to determine whether substantial evidence exists to support the trial court's action.").

## II. Scheduling and the Mode of Trial

 ¶ 41 Max contends that the trial court erred by (1) refusing to transfer the case to the probate presiding judge because the trial was anticipated to last more than one day, (2) denying his requests for a jury trial, and (3) excluding Max's counterclaims from the probate proceeding.

¶ 42 We apply a *de novo* standard of review to these issues. *Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue*, 209 Ariz. 71, 72, ¶ 6, 97 P.3d 896, 897 (App.2004) ("Ques-

tions of statutory interpretation are issues of law subject to de novo review."); *Stoudamire v. Simon*, 213 Ariz. 296, 297, ¶ 3, 141 P.3d 776, 777 (App.2006) ("[w]hether a defendant is entitled to a jury trial ... is a question of law and is reviewed de novo.").

### A. Refusal to Transfer

 ¶ 43 Max argues that the case should have been transferred to the probate presiding judge in accordance with Maricopa County Superior Court Administrative Order No. 93–037 because the trial was going to last more than one day. However, Max also submitted to this court, and we have considered, a 1998 Policy Statement by then-Presiding Probate/Mental Health Department Judge Donald F. Daughton that supplemented the 1993 order. The Policy Statement provides that "the Court Commissioner shall use his or her *discretion* to determine whether a contested matter should be transferred to the Presiding Probate Judge or should remain assigned to the Court Commissioner as a Judge Pro Tem." Probate/Mental Health Department Policy Statement re: Assignment and Management of Contested Cases, signed by Hon. Donald F. Daughton, Presiding Probate/Mental Health Department Judge (September 17, 1998) (emphasis added). Thus, even though the 1993 order was still in effect, the 1998 Policy Statement gave the commissioner the discretion to decide whether to retain the case. Max never argues that the commissioner abused her discretion in retaining the case, only that she "[e]rroneously [r]efused to [t]ransfer" it by failing to follow the 1993 order. Because the commissioner was not required to transfer the case, but had the discretion to retain it (which was not abused here), we affirm this aspect of the court's decision.[10]

### B. Right to a Jury Trial

 ¶ 44 Max contends that the trial court erred in failing to grant his request for

---

10. Neither Ilana nor Adina assert that the alleged error in failing to follow the Administrative Order, and transfer this matter from a Commissioner to the Presiding Probate Judge, was waived when not pursued by a special action. *Cf. Taliaferro v. Taliaferro*, 186 Ariz. 221, 921 P.2d 21

(1996) (holding that the denial of a peremptory right to a change of judge must be pursued, if at all, by special action relief and is waived for purposes of appeal). Accordingly, we do not address the issue of waiver on this claim of error.

a jury trial. We disagree. We begin with the premise that "there is no probate court apart from the superior court." *Marvin Johnson, P.C., v. Myers*, 184 Ariz. 98, 102, 907 P.2d 67, 71 (1995). Thus, "if a party to a probate proceeding is otherwise ... entitled to trial by jury, it gets one." *Id.* at 100, 907 P.2d at 69. Because "actions involving a common question of law or fact may be consolidated, joint hearings or trials may be held," and the probate court may end up hearing claims that are not normally associated with probate cases. *Id.* at 102, 907 P.2d at 71; Ariz. R. Civ. P. 42(a). To determine whether there is a right to a jury trial in a probate proceeding, each claim must be individually analyzed.[11] This principle is implicit in the section of the Arizona's Probate Code that deals with jury trials:

A. If duly demanded, a party is entitled to trial by jury in any proceeding in which any controverted question of fact arises as to which any party has a constitutional right to trial by jury.

B. If there is no right to trial by jury under subsection A or the right is waived, the court in its discretion may call a jury to decide any issue of fact, in which case the verdict is advisory only.

A.R.S. § 14-1306. To summarize, there is no mandatory right to a jury trial in probate proceedings unless one is constitutionally required. Thus, our inquiry becomes whether any of the individual causes of action at issue here created a constitutional right to a jury trial.

¶ 45 The Arizona Constitution preserves the right to a jury trial only in cases where it would have existed under the common law prior to statehood. *Life Inves-*

*tors Ins. Co. of America v. Horizon Resources Bethany, Ltd.*, 182 Ariz. 529, 532, 898 P.2d 478, 481 (App.1995) ("Arizona Constitution Article II, section 23 *preserves* a right to a jury trial only in those actions that existed at common law when the Arizona Constitution was adopted in 1910."). Unless the statute expressly so provides, there is no right to a jury trial on statutory claims that did not exist at common law prior to statehood. *Life Investors*, 182 Ariz. at 531–32, 898 P.2d at 480–81.

¶ 46 The first claim we analyze is the alleged violation of Arizona's Vulnerable Adult Statute, A.R.S. § 46–456. Max argues that a statutory right to a jury trial on this claim is created by language in A.R.S. § 46–456(E), which incorporates the following provision: "[t]he *court or jury* may order the payment of punitive damages under common law principles that are generally applicable to the award of punitive damages in other civil actions." § 46–455(H)(4) (emphasis added).

¶ 47 However, we interpret this language as merely acknowledging the principle we have already explained—that some claims for which there is no independent entitlement to a jury may be heard by a jury because they are consolidated with a claim arising out of the same set of facts for which there is a jury trial right. The legislature is capable of saying what it means. *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co.*, 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994) (explaining that fundamental to statutory interpretation "is the presumption that what the [l]egislature means, it will say") (internal citations and quotations omitted). If it had intended to create an independent statutory right to a

---

11. Thus, while jury trials historically have been discouraged in probate proceedings, it would be an overgeneralization to say that there is never a right to a jury trial in probate proceedings. *See In re Roarke's Estate*, 8 Ariz. 16, 20, 68 P. 527, 529 (1902) ("[T]he right of trial by jury is secured by the constitution only in cases in which it had previously existed in the administration of justice according to the course of common law. *Probate matters belonged to ecclesiastical jurisdiction, where a jury trial was not a right.*") (emphasis added); *see also Rudd v. Rudd*, 105 Idaho 112, 116, 666 P.2d 639, 643 (1983) ("[T]he right to trial by jury exist[s] only in cases at common law, not in cases triable in a court of equity."); *Cyr v.*

*Cote*, 396 A.2d 1013, 1017 (Me.1979) ("[T]he right to a jury trial in a will contest is not one of constitutional dimension ....") (citing *In re Estate of Howard*, 58 Cal.App.3d 250, 129 Cal.Rptr. 836 (1976)); *Petition of Atkins*, 126 N.H. 577, 578–79, 493 A.2d 1203, 1204 (1985) (The right to a jury trial in "probate matters ... is not constitutionally guaranteed, nor did it exist at common law."); *Jones v. Sands*, 41 Tenn.App. 1, 12, 292 S.W.2d 492, 497 (1953) ("[T]he right of jury trial in will contests is purely statutory."); The Pros and Cons of Jury Trials in Will Contests, 1990 U. Chi. Legal F. 529, 534 n. 44 (1990) (arguing that jury trials should not be permitted in will contests and citing the foregoing).

jury trial for vulnerable adult claims, it would have said so.

¶ 48 The language referencing a jury in § 46–455(H)(4) could also be referring to § 14–1306(B). This provision allows the probate court the discretion to call an advisory jury in cases where there is no right to a jury or the right has been waived. In neither case, however, does § 46–456(E) create an independent entitlement to a jury trial.

¶ 49 Max also asserts that he was wrongfully denied a right to a jury trial on his claims for defamation, wrongful *lis pendens*, and conversion. However, these claims were not a part of this trial.[12] Thus, there can be no claim of error with regard to this proceeding.

¶ 50 Max summarily argues that he was entitled to a jury trial of the A.R.S. § 14–3709 claim against him; however, the rights created therein are statutory with no provision for a jury trial. Thus, there is no right to a jury trial as to this claim.

¶ 51 As to the breach of fiduciary duty claim, Max cites to *Taeger v. Catholic Family & Community Services*, 196 Ariz. 285, 995 P.2d 721 (App.1999). However, in *Taeger* the court does not analyze, let alone conclude, that there is a constitutional right to a jury trial for a breach of fiduciary duty case. *Id.*

¶ 52 Though a jury was empanelled in the *Taeger* case, in which adoptive parents sued an adoption agency for fraud, negligence, and breach of contract, the constitutional right to a jury trial was never directly at issue on appeal. 196 Ariz. at 289, ¶ 7, 995 P.2d at 725. The trial court directed a verdict in favor of the defendants on the constructive fraud claim, believing that no underlying fiduciary duty existed as a matter of law. *Id.* at 289, ¶ 9, 995 P.2d at 725. This court reversed, holding that a fact question existed as to whether there was a fiduciary relationship and that the constructive fraud claim should have gone to the jury with the other common law claims. *Id.* at 294, ¶ 27, 995 P.2d at 730.

¶ 53 In analyzing the question of whether there is a right to a jury trial for a breach of a fiduciary duty claim, we base our analysis on two premises: (1) claims for breach of fiduciary duty are equitable actions, and (2) no constitutional right to a jury trial exists for actions that were considered equitable at or near the time Arizona's constitution was adopted. *Henry v. Mayer*, 6 Ariz. 103, 114, 53 P. 590, 593 (Ariz.Terr.1898) ("[T]he cause being one of equitable jurisdiction, the court below was not bound to submit any issue of fact to a jury, but, on the contrary, might, in its discretion, have properly refused the request made by the appellee ... for a jury trial."); *Cole v. Bean*, 1 Ariz. 377, 378, 25 P. 538, 539 (Ariz.Terr.1878) (explaining that in cases in equity proceedings, "there seems to be no reason for the intervention of a jury" unless the court desires one).

¶ 54 As to the first premise, that a breach of a fiduciary duty (even if in the form of a tort) is an equitable action, the parties have not cited, nor have we found, Arizona cases on this issue. However, there is a substantial body of case law from other jurisdictions establishing this point. *See, e.g., Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 61 (1st Cir.2003) ("[A] claim of 'breach of fiduciary duty' has long been recognized as an equitable cause of action, to which no right to jury trial attaches."); *In re RDM Sports Group, Inc.*, 260 B.R. 915, 919 (Bankr.N.D.Ga.2001) ("[A]n action for breach of fiduciary duty was once within the exclusive jurisdiction of courts of equity.") (internal quotations omitted); *Termini v. Life Ins. Co. of N. Am.*, 474 F.Supp.2d 775, 778 (E.D.Va.2007) ("[P]laintiff's claims for breach of fiduciary duty are not triable by a jury. Such actions are examined under trust law principles and fiduciary standards, which are within the exclusive jurisdiction of equity courts."); 47 Am.Jur.2d, *Jury* § 59 (2007) ("Generally, issues of an alleged breach of the fiduciary duties of a trustee are equitable in nature and a party has no right to a trial by jury."). Thus, we consider a breach of fiduciary duty claim to be an equitable claim.

¶ 55 The second premise in our analysis is that there is no constitutional right in

---

12. As explained above, the conversion claim was withdrawn before trial. Max's counterclaims for

defamation and wrongful *lis pendens* were excluded from trial. *See infra* ¶¶ 60–63.

Arizona for a jury trial of claims that would have been considered equitable at the time Arizona's constitution was adopted. With regard to equitable actions the Arizona Supreme Court stated the following:

> Even if this action [is] considered as in equity, nevertheless defendant conceives that he was entitled to a jury trial. He cites the case of *Brown v. Greer*, 16 Ariz. 215, 141 Pac. [P.] 841, in which there is to be found a dictum to the effect *that the Constitution of the state guarantees trial by jury in all cases, without any distinction of law or equity. That is not the law of this state,* and has never been. The organic act, supported by a number of decisions of this court, both before and since statehood, is in conflict with it. The Constitution does not assume to create any such right. On the contrary it preserves and perpetuates equity jurisdiction, expressly vesting it in the courts of the state. Arizona Constitution, art. 6, § 6.

*Davis v. First Nat. Bank*, 26 Ariz. 621, 626, 229 P. 391, 392 (1924) (emphasis added).

¶ 56 We recognize, as noted in the excerpt from *Davis* above, that earlier supreme court decisions have referred to a mandatory right to a jury trial and whether that jury is to act in an advisory or non-advisory capacity. As explained in *Hoyle v. Superior Court*, 161 Ariz. 224, 230, 778 P.2d 259, 264 (App.1989), "the 1913 Civil Code provided that either party in a civil action had the right to submit all issues of fact to a jury.... [This provision] was deleted from the 1928 Revised Code and was replaced by a provision that *did not grant a substantive right to a jury trial in civil actions."* We agree with *Hoyle* that subsequent cases that relied on the 1913 statute as it was interpreted by *Brown v. Greer*, 16 Ariz. 215, 218, 141 P. 841, 842 (1914), do not provide an independent statutory or constitutional basis for requiring a jury for equitable claims.

■ ¶ 57 We thus find no error in the trial court's determination that there is no right to a jury trial for breach of fiduciary duty cases relating to a trustee's duties in probate proceedings. Because we find no jury trial right in such cases, Max's arguments that the statutory claims (A.R.S. §§ 46–456 and 14–3709(D)) are entitled to trial by jury likewise fail, given that they are based on breach of fiduciary duty.

¶ 58 Max's argument for a jury trial on his claims to remove Adina as personal representative and Adina and Ilana as co-trustees is that "[g]iven the fact that a jury was required on all of the other claims, the [trial court] should have allowed the jury to render an advisory verdict and factual findings on these claims." As we have explained, the other claims do *not* require a jury trial. Thus, this argument is without merit.

¶ 59 For all the foregoing reasons, we find no error in the trial court's denial of Max's request for a jury trial.

### C. Max's Counterclaims

¶ 60 Max argues that the trial court "proceeded to decide" his counterclaims, "despite precluding Max from presenting the claims at trial." We agree in part with Max's contention and find error.

■ ¶ 61 The trial court limited trial issues to Max's Petition for Removal and to Adina's Petition to Recover Assets.[13] The trial court clearly had the discretion to do so. *Marvin Johnson*, 184 Ariz. at 102, 907 P.2d at 71 ("[U]nder Rule 42(b), Ariz.R.Civ.P., a court may order separate trials for claims within a case in order to further the convenience of the parties or to avoid prejudice."); *Findlay v. Lewis*, 172 Ariz. 343, 346, 837 P.2d 145, 148 (1992) ("A trial court has broad discretion over the management of its docket. Appellate courts do not substitute their judg-

13. The trial court ruled in a minute entry that "[t]he matters to be heard at trial are limited to Max Newman's Petition for Removal of Adina Newman as Personal Representative and Co–Trustee and for Removal of Ilana Newman as Co–Trustee and the Personal Representative and Trustee's claims for accountings and recovery of funds." Max's counterclaims were initially al-

leged in his Amended Response to Adina's First Amended Petition for Recovery of Estate Assets and answered by Adina prior to this ruling. Subsequent minute entries do not address the ultimate disposition of these claims, and they were never decided. They were only addressed by the court as discussed below in ¶ 62, *infra*.

ment for that of the trial court in the day-to-day management of cases.").

¶ 62 Notwithstanding that the court did not resolve Max's other claims, the trial court used those filings as a basis for sanctions. The trial court found as follows:

¶ 202 The Court further finds that Max has filed pleadings that have unreasonably expanded this litigation, including multiple petitions for removal of the Personal Representative and the Trustees, a petition to enforce a purported disclaimer letter, a defamation claim, a wrongful lis pendens claim and numerous frivolous motion papers. These actions served to further obstruct administration of the Estate and Trust.

¶ 203 The Court finds that Max's actions in this regard were unreasonable, in bad faith, and were undertaken for the purpose of harassment and delay.

It is clear that the trial court considered matters that had been excluded from trial (the defamation claim and the wrongful *lis pendens* claim) to be "unreasonable, in bad faith, and ... undertaken for the purpose of harassment and delay." Max, however, was prevented from producing any evidence at trial with regard to these claims. Accordingly, it was error to use those claims as a basis for sanctions in this matter.

¶ 63 However, this error does not impact the present sanctions award because the double damages assessed against Max under A.R.S. § 14–3709 have been vacated as discussed above in ¶ 27, *supra*, and the forfeiture penalty under A.R.S. 46–356 was based on Max's conduct prior to Celia's death and had nothing to do with his counterclaims. Our holding simply precludes the findings with regard to the matters not set for trial (or previously determined on the merits) from being used as a basis to assess sanctions in the future without giving Max an opportunity to be heard on those claims.

### III. Admissibility of Expert Opinions

¶ 64 Max argues that the trial court erred (1) in permitting Adina to use two untimely disclosed experts; (2) in failing to rule on his motion to exclude the experts

"until the eve of trial," which allegedly prevented him from obtaining rebuttal experts; and (3) in admitting into evidence a written report that he alleges contained legal conclusions by one of Adina's supposedly untimely-disclosed experts. We review a trial court's evidentiary rulings for abuse of discretion. *Smyser v. City of Peoria,* 215 Ariz. 428, 440, ¶ 39, 160 P.3d 1186, 1198 (App.2007).

¶ 65 Max's position that all testifying experts must be disclosed in the initial disclosure statement—or be prohibited from testifying—is untenable. While Rule 26.1 does require that the initial disclosure statement be filed within forty days of the responsive pleading, it also recognizes that not all information may be available until substantial discovery has been undertaken; this is one of the reasons that Rule 26.1(b) imposes a "continuing duty" to disclose. Here, though the record is unclear as to exactly when it was decided that the experts would testify at trial, there is evidence to suggest that they were disclosed as consulting experts on May 19, 2005 (Julia Miessner) and December 7, 2005 (Dr. Pamela Willson). They were designated as testifying experts on June 21, 2006, and their expert reports were disclosed on June 30, 2006. Thus, disclosure occurred one month before the discovery deadline and approximately three and one-half months before trial. We discern no abuse of discretion on this record. Any prejudice Max suffered by waiting until the eve of trial for the court's ruling on this matter was self-imposed; nothing prevented Max from engaging his own experts and conducting any necessary discovery.

¶ 66 Max also argues that Dr. Willson's report was "replete with highly prejudicial, inflammatory, and inadmissible evidence," though he fails to identify any particular statement in the fourteen-page report to back up his assertions. He claims that the report contained inappropriate "legal conclusions." Our review of the report has not revealed the prejudicial and inflammatory statements Max mentions, nor has it revealed any inappropriate legal conclusions. Even if they did exist, however, "the court will be presumed to have ignored ... improper evidence, and its judgment will be

affirmed if there is sufficient proper evidence to sustain it." *Taylor v. Mueller,* 24 Ariz. App. 403, 410, 539 P.2d 517, 524 (1975). Moreover, if the report was erroneously admitted, any error would be harmless, given that the case was tried before a judge and not a jury. *See Norvelle v. Lucas,* 3 Ariz. App. 464, 465, 415 P.2d 478, 479 (1966) ("When evidence is erroneously admitted by a trial court sitting without a jury, the court is presumed to have ignored such testimony.").

### Conclusion

¶ 67 For the reasons set forth above, we affirm and reverse the trial court's judgment as indicated, vacate the double damages awarded pursuant to § 14–3709, and remand for a calculation of prejudgment interest. We decline to award attorneys' fees to either party.

CONCURRING: PATRICK IRVINE and DIANE M. JOHNSEN, Judges.

