NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In the matter of the Guardianship of and Conservatorship for:

MARIE-THERESE SPECTOR, *An Adult.*

VICKI SHAW, *Petitioner/Appellee,*

*v.*

ARLENE ARDI, *Respondent/Appellant.*

No. 1 CA-CV 21-0346
FILED 2-3-2022

Appeal from the Superior Court in Maricopa County
No. PB2015-051412
The Honorable Jane E. McLaughlin, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Baumann Doyle Paytas & Bernstein PLLC, Phoenix
By Gary T. Doyle
*Co-counsel for Appellee Spector*

Van Camp & Leonard, Glendale
By Tracy Ann Leonard
*Co-counsel for Appellee Spector*

Frazer Ryan Goldberg & Arnold LLP, Phoenix
By Joshua N. Mozell
*Counsel for Petitioner Appellee Shaw*

Wilenchik & Bartness PC, Phoenix
By Dennis I. Wilenchik
*Co-counsel for Respondent/Appellant*

Husch Blackwell LLP, Phoenix
By Brian J. Hembd
*Co-counsel for Respondent/Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Jennifer B. Campbell and Judge James B. Morse Jr. joined.

---

**H O W E**, Judge:

**¶1**        Appellant Arlene Ardi challenges the superior court's order converting her general guardianship over her mother, Marie-Therese Spector, to a limited guardianship. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

**¶2**        Ardi was appointed permanent guardian and conservator for Spector in 2016. As part of that appointment, the court granted Ardi

> the right and ability to restrict communication and any form of contact with [Spector] from anyone. This includes communication or contact of any kind from anyone [] Ardi deems to be a detriment to [Spector's] well-being. It also includes the ability of [] Ardi to restrict anyone from coming near [Spector].

The court also authorized the continuing appointment of a guardian ad litem for Spector.

**¶3**        In January 2019, Vicki Shaw, a longtime friend of Spector, petitioned to substitute a third-party guardian in place of Ardi, alleging that Ardi had prevented Spector from communicating with her closest friends.

2

About a year later, Shaw moved for an independent evaluation of Spector, who had not been evaluated since 2015. The parties later agreed at mediation to have the mediator select an independent psychological health professional to conduct the evaluation.

**¶4** The evaluator, Dr. Gina Touch Mercer, submitted a written report in October 2020 in which she concluded that Spector's cognitive limitations required "a new and evolving set of responsibilities in providing for [her] needs." Dr. Mercer recommended, among other things,

> (1) neurology and pharmacy consultations;

> (2) retaining a geriatric care manager;

> (3) identifying a potential successor guardian and conservator if Ardi delayed or failed to act on the geriatric care manager's care plan; and

> (4) allowing supervised contact and visits, including with Spector's friends.

Dr. Mercer also recommended removing Ardi as Spector's guardian.

**¶5** Based in part on Dr. Mercer's recommendations, Shaw filed an emergency petition to substitute Ardi as guardian and conservator. Dr. Mercer later prepared an addendum to her report recommending that, rather than remove Ardi outright, the court appoint a geriatric care manager to assist Ardi.

**¶6** The commissioner assigned to the case set the emergency petition and Shaw's 2019 petition for an initial hearing in December 2020. Before the initial hearing, Ardi moved to transfer the case to a superior court judge, contending the commissioner lacked authority to hear contested probate matters under Arizona Supreme Court Rule 96(a)(5). The commissioner denied the motion because she also was appointed as a judge pro tempore with all the judicial powers of a superior court judge.

**¶7** After conducting the initial hearing and a full evidentiary hearing, the commissioner issued a detailed ruling finding that Ardi had inadequately carried out her duties as Spector's guardian. The commissioner terminated Ardi's general guardianship and appointed Ardi as Spector's permanent limited guardian with restrictions aimed at (1) ensuring Ardi's better compliance with her duties as guardian, (2) rectifying Ardi's prior failures to ensure her mother's medical and mental

health care needs were being met to the greatest possible degree, and (3) eliminating Ardi's ability to make decisions about her mother's contact with people with whom she had a significant relationship before Ardi became her guardian. As relevant to this appeal, the commissioner revoked Ardi's prior authority "to limit, prohibit, or authorize social contact or visitation with the Ward by any person." The commissioner also appointed a statutory representative to oversee social contact and visitation with Spector and retained the geriatric care manager Ardi had hired after the initial hearing.

¶8 Ardi timely appealed from the commissioner's order. We have jurisdiction under A.R.S. § 12–2101(A)(9).

**DISCUSSION**

¶9 Ardi argues that the Judge Pro Tempore acted without authority to decide the contested probate matter and that even if she had authority to determine the matter, she abused her discretion in limiting Ardi's guardianship. This court reviews review guardianship orders for an abuse of discretion. *Matter of Guardianship of Kelly*, 184 Ariz. 514, 518 (App. 1996).

I. **The Commissioner, Also Appointed as a Judge Pro Tempore, Was Authorized to Decide This Contested Probate Matter.**

¶10 A commissioner's power to act stems from the Arizona Constitution and rules promulgated by the Arizona Supreme Court. Ariz. Const. Art. 6, § 24; A.R.S. § 12–213(A); *Green v. Thompson*, 17 Ariz.App. 587, 590 (1972). Commissioners can hear and determine, among other things, uncontested matters arising under Arizona's Probate Code, Ariz. R. Sup. Ct. 96(a)(5), but cannot hear contested probate matters, *id.*; *In re Estate of de Escandon*, 215 Ariz. 247, 249 ¶ 8 (App. 2007).

¶11 Ardi objected to Shaw's petitions thereby making the matter contested. *See* Ariz. R. Prob. P. 5(a) ("A hearing becomes contested as described in Rule 15(e)"); Ariz. R. Prob. P. 15(e) (stating generally that a probate proceeding becomes contested when "an interested person opposes a petition"). While commissioners cannot decide contested probate matters, the commissioner was also a duly appointed judge pro tempore. *See* Arizona Supreme Court Pro Tempore Order No. 2020-19; Maricopa County Superior Court Administrative Order 2020-094. A judge pro tempore generally has the same authority as a full-time regularly seated superior court judge. Ariz. Const. Art. 6, § 31(B); A.R.S. § 12–144(D); *Vera v. Rogers*, 246 Ariz. 30, 35 n.5 ¶ 19 (App. 2018).

¶12 Ardi did not and does not challenge the commissioner's appointment as a judge pro tempore. Indeed, she does not mention the appointment in her opening brief. Her argument that the commissioner lacked authority to hear this contested probate matter is therefore meritless.

## II. The Commissioner Did Not Abuse Her Discretion in Limiting Ardi's Guardianship Authority.

¶13 "On petition of the ward or any person interested in the ward's welfare, or on the court's own initiative, the court shall substitute a guardian and appoint a successor if it is in the best interest of the ward." A.R.S. § 14–5307(A). The court also may appoint a limited guardian "[i]n conformity with the evidence regarding the extent of the ward's incapacity" and in doing so may "specify . . . limitations on the guardian's powers." A.R.S. § 14–5304(C). "In exercising its appointment authority . . . , the court shall encourage the development of maximum self-reliance and independence of the incapacitated person." A.R.S. § 14–5304(A).

¶14 The court did not error in limiting Ardi's guardianship authority. The commissioner found that Ardi had "exercised her authority to control [Spector's] interactions overbroadly and unreasonably." The record support for this finding is significant: several witnesses testified that they were denied contact with Spector. Ardi offered no specific testimony to show that any of them posed actual danger to Spector. Additionally, the geriatric case manager Ardi appointed after the initial hearing testified that Ardi continued to block contact between Spector and Shaw and several others by placing "HIPAA Alerts" on them. The record therefore supports the court's conclusion.

¶15 Ardi nevertheless argues that her compliance with prior court orders should preclude the court's limitation of her guardianship now. She relies on the 2016 appointment order that, as quoted above, granted her authority to "restrict communication and any form of contact with [Spector] from anyone." Based on that provision, she contends the commissioner should have given her continuing unfettered authority to restrict contact with Spector.

¶16 A guardian's compliance with existing court orders does not limit the court's authority to substitute the guardian, however. *See* A.R.S. § 14–5307(A) ("The court does not need to find that the guardian acted inappropriately to find that the substitution is in the ward's best interest."). In any event, the commissioner correctly noted that the provision conflicts with A.R.S. § 14–5316(B), effective January 1, 2017, which allows a guardian

to "limit, restrict or prohibit contact between the ward and any person if the guardian *reasonably* believes that the contact will be detrimental to the ward's health, safety or welfare." (emphasis added)

¶17         Ardi's appeal does not address how any person posed an actual or speculative danger to Spector or why she had placed "HIPAA Alerts" on various persons close to Spector. Indeed, the only evidence she cites to challenge the commissioner's findings that she acted unreasonably is two injunctions against harassment entered against Shaw in 2017 and 2018, both of which have expired. *See* A.R.S. § 12–1809(J) ("The injunction is effective on the defendant on service of a copy of the injunction and petition and expires one year after service on the defendant."). She also cites no authority that the commissioner needed to uphold the 2016 appointment order given Dr. Mercer's concern that continuing to isolate Spector could be detrimental. Thus, the commissioner did not abuse her discretion in finding that Ardi had "fail[ed] to encourage and actively facilitate the continuation of her mother's significant relationships." *See* A.R.S. § 14–5316(A) ("A guardian shall encourage and allow contact between the ward and other persons who have a significant relationship with the ward.").

¶18         Ardi next argues that the court erred in limiting her guardianship powers because she "has always followed the guidance of medical professionals and had any one of them suggested different evaluation, [she] would have provided such further evaluation." The record suggests, however, that she tried to delay Dr. Mercer's evaluation by (1) arguing that other medical professionals concluded in 2017, 2018, and 2019 that Spector "should be in a locked memory care unit," and (2) insisting that Shaw pay for Dr. Mercer's evaluation.

¶19         Ardi cites the same 2017-19 recommendations that Spector remain in a memory care facility to contend she followed medical recommendations but concedes Dr. Mercer did not agree with those assessments. She also argues that she acted to implement Dr. Mercer's recommendations, including "hiring a Care Manager, hiring additional caregivers beyond those already in place and the 24/7 caregivers at Maravilla, and arranging for numerous and extensive evaluations and treatments." But neither she nor her counsel reached out to Dr. Mercer before the initial hearing on Shaw's petition. She also failed to hire a geriatric care manager until after the commissioner urged her "to concentrate on [Dr. Mercer's] recommendations with regard to her mother's well-being" at the conclusion of the initial hearing.

¶20 In fact, Ardi testified at that hearing that she first learned of Dr. Mercer's recommendations the day before. She also testified that she "had never been told" that Dr. Mercer's recommendations were "necessary," instead stating that she followed her counsel's advice. Ardi also testified she did not carefully read Dr. Mercer's report because it was "very disturbing," arguing that Shaw and others — but not Dr. Mercer — had committed "elder abuse." She did not, however, present any specific testimony to support these serious allegations, leading the commissioner to conclude that the allegations were "significantly lacking in credibility, meaningful detail and corroboration by competent evidence."

¶21 Ardi declined the opportunity to support her allegations. The commissioner stated at the close of the initial hearing that she "hope[d] that [Ardi] can offer her own direct knowledge of her mother's care, intimate knowledge of what is being recommended and why" at the full hearing. But Ardi chose not to testify at the full hearing. The geriatric care manager instead testified vaguely that Ardi had helped implement Dr. Mercer's recommendations since the initial hearing. But one of Dr. Mercer's recommendations was that Spector be allowed to have supervised visits with Shaw and others. As noted above, the geriatric care manager testified that Ardi had used "HIPAA Alerts" to block any such socialization opportunities.

¶22 Given this evidence, the commissioner did not abuse her discretion finding not credible Ardi's testimony that she would have followed Dr. Mercer's recommendations. *See In re Estate of Newman*, 219 Ariz. 260, 271 ¶ 40 (App. 2008) ("[I]t is not the function of this court . . . to second-guess the credibility determinations of the judge who had the opportunity to evaluate the witnesses' demeanor and make informed credibility determinations.").

¶23 Ardi further argues that she should remain Spector's general guardian because she has legal priority as Spector's adult child. A.R.S. § 14–5311(B)(5). But she is not entitled to be Spector's general guardian simply because she is Spector's adult child; A.R.S. § 14–5311(F) allows the court to "pass over a person who has priority and appoint a person who has a lower priority or no priority" for good cause. And while she did not request specific findings on the court's good cause determination as § 14–5311(G) required, the commissioner explained in detail her decision to limit Ardi's guardianship powers.

¶24 She also argues that she holds legal priority under a February 2015 durable general power of attorney. *See* A.R.S. § 14–5311(B)(3). The

commissioner found Spector revoked that power of attorney in September 2015 and had "consistently expressed her disagreement with the guardianship" when she "was able to understand much, if not the majority, of the guardianship proceedings." Ardi does not mention, much less challenge, these findings on appeal.

## III.    Attorneys' Fees on Appeal

¶25       Ardi requests attorneys' fees incurred in this appeal under A.R.S. §§ 14–5307, –1105, and 12–349. Section 14-5307(A) allows guardians and their counsel to be compensated from the ward's estate for defending against a petition for substitution, but "only for the amount ordered by the court and on petition by the guardian or the guardian's attorney." "Petition" is defined in the Probate Code as "a written request to the court for an order after notice," and "court" is defined as "the superior court." A.R.S. § 14–1201(11), (48). Section § 14–5307(A) therefore does not authorize a fee award on appeal.

¶26       Section 14–1105(B) allows the superior court to impose fees and expenses on a party or its counsel if it finds "that a ward or protected person has incurred professional fees or expenses as a result of unreasonable conduct." Even assuming this provision applies on appeal, Shaw did not act unreasonably.

¶27       Section 12–349(A) authorizes a fee award if a party (1) brings or defends a claim without substantial justification; (2) brings or defends a claim solely or primarily for delay or harassment; (3) unreasonably expands or delays the proceeding; or (4) engages in abuse of discovery. Ardi offers no argument on appeal to suggest any of these occurred. We therefore decline to award fees.

## CONCLUSION

**¶28** For the reasons stated, we affirm. Shaw and Spector's guardian ad litem, who joined in Shaw's answering brief, may recover their taxable costs incurred in this appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED:    AA